FN0460037

ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORTH WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN - 7 2016

CLERK, U.S. DISTRICT COURT
By \NC3.33
          Deputy

| | |
|---|---|
| DONNA Y. T. CHING, as Trustee of the Ching Family Trust (Trust B), Restated March 22, 1984, and under Declaration of Trust Split dated June 7, 2014, | ) ) ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) |
| VRE CHICAGO ELEVEN, LLC, Serve: B. Jason Keen, Registered Agent 1211 S. White Chapel Blvd. Southlake, TX  76092, | ) ) ) ) ) |
| VERDAD REAL ESTATE, INC., Serve: B. Jason Keen, Registered Agent 1211 S. White Chapel Blvd. Southlake, TX  76092, | ) ) ) ) ) |
| EXP REALTY ADVISORS, INC., Serve: Robert Pendleton James, CEO 118 East 28th Street Suites 808 and 901 New York, NY  10016, | ) ) ) ) ) ) |
| and | ) ) |
| TARTAN REALTY GROUP, INC., Serve: Doug Reichl, Registered Agent 350 W. Hubbard St., #640 Chicago, IL  60654, | ) ) ) ) ) |
| *Defendants.* | ) ) |

Case No.

# 4-16CV-428-0

**PLAINTIFF DEMANDS
TRIAL BY JURY**

## COMPLAINT

Comes now Donna Y. T. Ching ("Plaintiff"), as Trustee of the Ching Family Trust (Trust

B), Restated March 22, 1984, and under Declaration of Trust Split dated June 7, 2014 (the

"Trust"), and states as follows for her Complaint:

SL 1917865.5

## PARTIES AND JURISDICTION

1.      Plaintiff, a 79-year old widow, is the Trustee of the Trust.  Plaintiff is a citizen and resident of the State of California.  Consequently, the Trust also is a citizen and resident of the State of California for purposes of 28 U.S.C. § 1332.

2.      Defendant VRE Chicago Eleven, LLC ("VRE") is a limited liability company formed and existing under the laws of the State of Texas.  Upon information and belief, each member of VRE is a citizen of the State of Texas or some state other than California.

3.      Defendant Verdad Real Estate, Inc. ("Verdad") is a corporation organized and existing under the laws of the State of Texas, and having its principal place of business in Texas. Verdad advertises itself, on its website, as being "one of the nation's leading single-tenant real estate developers," having "almost 500 projects completed in 33 states, and over $800mm in real estate transactions."  According to Verdad, "[t]he largest national brands trust Verdad from site selection to store opening."   Among the services Verdad advertises are project financing, development and capital solutions, underwriting, and "expert economic analysis & sales week increases."  As described more fully below, on information and belief, Verdad and VRE are the alter ego of one another.

4.      Defendant EXP Realty Advisors, Inc. ("EXP") is a corporation organized and existing under the laws of the State of New York, and having its principal place of business in New York.  EXP served as Verdad's and/or VRE's broker in their sale of real property and improvements which forms the basis for this action.

5.      Defendant Tartan Realty Group, Inc. ("Tartan") is a corporation organized and existing under the laws of the State of Illinois, and having its principal place of business in

SL 1917865.5

Illinois. Tartan served as the Illinois broker of record for EXP, VRE and/or Verdad in connection with the listing and sale of the property that is the subject of this litigation.

6.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a), because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.     This Court may exercise personal jurisdiction over the defendants because: (a) VRE consented to same by contract; (b) on information and belief, VRE and Verdad are the alter ego of one another; (c) VRE and Verdad are incorporated, and have their principal place of business, in Texas; and (d) EXP and Tartan agreed to serve, and did serve, as Verdad's and/or VRE's broker in their sale of real property and improvements which forms the basis for this action, and therefore transacted business in Texas. With respect to the out-of-state defendants, the foregoing facts satisfy Texas's long-arm statute, Tex. Civ. Prac. & Rem. Code §§ 17.041 *et seq.*, and exercise of personal jurisdiction over the out-of-state defendants comports with constitutional due process.

8.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), because Verdad is a resident of this judicial district, a substantial part of the events or omissions giving rise to Plaintiff' claims occurred in this district, and/or some or all of the defendants may be deemed residents of this district or otherwise may be subject to suit in this district.

## FACTS COMMON TO ALL COUNTS

## I.     VERDAD'S ACQUISITION OF PROPERTY

9.     On information and belief, in or around 2014, Verdad acquired at least eleven properties used for fast food businesses from one or more entities owned and/or controlled by Jason LeVecke ("LeVecke").

SL 1917865.5

10.    On information and belief, before and/or after the acquisition, Verdad formulated a plan and the intent to sell at least eleven of the acquired properties to unsuspecting buyers for inflated prices.

11.    Verdad effected the said acquisition and subsequent sales through various wholly-owned subsidiary entities it created, including VRE; VRE Chandler, LLC; VRE Waxahachie, LLC; VRE Forsyth, LLC; VRE Grayslake, LLC; VRE Joliet, LLC; and VRE Libertyville, LLC.

12.    Upon information and belief, Verdad's subsidiary companies, including VRE, were controlled entirely by Verdad, inadequately capitalized, and had no separate existence from Verdad, and they and Verdad were the alter ego of one another.  Among other things, Jason Keen – a principal of Verdad and one of the six "team members" featured on Verdad's website – is the manager of VRE.  Accordingly, Verdad is liable for the acts, omissions and wrongful conduct of VRE.

13.    One of the properties Verdad acquired was located at 107 E. 95th St., in Chicago, Illinois (the "Property").  In March, 2014, Verdad acquired the Property, through its VRE subsidiary, from JC 123 Holdings, LLC ("JC"), one of the entities owned and/or controlled by LeVecke.  Upon information and belief, VRE paid $1,425,000 for the Property.  At all pertinent times, both before and after the acquisition, a Kentucky Fried Chicken ("KFC") fast food restaurant was operated at the Property.

14.    Commencing in or around April, 2014 and continuing until February 27, 2015, VRE was the landlord of the Property under a written lease agreement between VRE and Frontier Star, LLC ("Frontier Star") or Frontier Star 1, LLC ("FS1"), other entities owned and/or controlled by LeVecke, with such lease being executed before the sale, to take effect after the sale.

4

15.     Beginning on or about February 27, 2015, the lease between VRE, as landlord, and Frontier Star or FS1, as tenant, was terminated, and VRE entered into a new lease for the Property with MJC Holdings 123, LLC ("MJC"), as tenant, another entity owned and/or controlled by LeVecke.

16.     Upon information and belief, MJC continued the business of operating a KFC restaurant at the Property uninterrupted.

17.     In connection with the February 27, 2015 lease to MJC, FS1 and LeVecke, personally, gave unconditional guarantees of MJC's performance under the lease.

18.     The February 27, 2015 lease called for MJC's payment of minimum monthly rent of $14,250.00, which translates to $171,000.00 annually, for the first five years of the lease term.

19.     On information and belief, the February 27, 2015 lease provided for payment of rent at a level substantially higher than the rent the Property was generating prior to VRE's acquisition of it, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues; and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value.

## II.     MARKETING OF PROPERTY

20.     Less than a year after acquiring the Property, Verdad, through VRE, placed it on the market.

21.     Tartan and EXP, on behalf of Verdad and VRE, marketed the Property through a brochure and offering circular that contained false and misleading information and

SL 1917865.5

representations in multiple respects.  (True copies of the said brochure and offering circular are appended hereto as Exhibits 1 and 2, respectively.)  Among other things:

      a.     The brochure touted the financial strength of FS1, which was a guarantor of the February 27, 2015 lease, with Verdad, VRE, EXP and Tartan knowing that the financial strength of the lease guarantor would operate as a substantial inducement to a prospective purchaser, and serve to inflate the value of the Property.  The brochure represented that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million.  All of the foregoing financial information was false and, on information and belief, Verdad, VRE, EXP and Tartan knew of the falsity of that information, or made representations concerning the financial strength of FS1 without having any proper basis for knowing whether the representations were true.

      b.     The offering circular for the Property represented that FS1 was, and would be, the tenant of the Property, and touted the tenant as operating 22 KFC restaurants in the Chicago Market, and as being one of the largest multi-unit franchise restaurant operators with over 200 locations, with Verdad, VRE, EXP and Tartan knowing that the size, strength and experience of the franchise operator would operate as a substantial inducement to a prospective purchaser, and serve to inflate the value of the Property.  The foregoing representations were false in that, from and after February 27, 2015, the tenant of the Property was MJC, which had no track record as a KFC franchisee, and may not even have been an authorized KFC franchisee at that time.  On information and belief, Verdad, VRE, EXP and Tartan knew of the falsity of the foregoing representations, or made the representations without having any proper basis for knowing whether they were true.

SL 1917865.5

c.      The offering circular for the Property represented that the Property was generating, and would in the future generate, rental income in the amount of $171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year, with Verdad, VRE, EXP and Tartan knowing that rental income generated, and to be generated, from the Property would operate as a substantial inducement to a prospective purchaser, and serve to inflate the value of the Property. The foregoing representations were false in that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular. On information and belief, Verdad, VRE, EXP and Tartan knew of the falsity of the foregoing representations, or made the representations without having any proper basis for knowing whether they were true.

22.     Prior to Plaintiff entering into a sale contract for the Property, Plaintiff made clear to EXP through its employees and agents, Russell Smith and Bob Moorhead, and through them to Verdad, VRE and Tartan, that Plaintiff wished to see financial statements and sales data relating specifically to the Property. In an e-mail dated March 4, 2015, EXP, through Bob Moorhead, on behalf of itself, Verdad, VRE and Tartan, represented to Plaintiff through her agent, Paul Matusik, that: "we do not have unit level sales. We have asked the franchisee for them and he said he will not provide because he is uncomfortable violating his franchise agreement to not release store level sales. He has told us that he is up 30% in the stores since he acquired them last year and projects a $1.2M+ AUV by year end and a $1.5M+ AUV in the 2016/2017 range."

23.     Upon information and belief, what was stated in the foregoing March 4, 2015 e-mail was false and misleading in a number of respects, including but not limited to the

SL 1917865.5

suggestion that the KFC franchise agreement prohibited releasing store level sales, the statements concerning actual and projected operating results, and the representation that Defendants did not have any information concerning unit level sales. Disseminating the foregoing false and misleading information precluded Plaintiff from conducting meaningful due diligence beyond what was provided in Exhibits 1 and 2 hereto, and induced Plaintiff to rely on the information and representations in Exhibits 1 and 2, and the other information provided, as referenced herein, much of which proved to be false and fraudulent.

24.     Also prior to Plaintiff entering into a sale contract for the Property, Russell Smith of EXP, on behalf of all Defendants, orally represented to Plaintiff, through her agent, Paul Matusik, that the normal ratio of rent expense to gross revenues for a KFC store was 8 percent, and that the ratio for the store at the Property was below 8 percent. The foregoing representation that the ratio of rent expense to gross revenues for the KFC store at the Property was below 8 percent was false.

25.     Disclosure of truthful unit level sales for the Property would have revealed that the rent levels provided for in the February 27, 2015 lease were not viable or sustainable, and that information, accordingly, was material. On information and belief, Verdad, VRE, EXP and/or Tartan knew of the falsity of the representations set forth in the March 4, 2015 e-mail, and the representations made orally by Russell Smith, and made, or permitted the making of them, either with knowledge of their falsity, or without having any proper basis for knowing whether they were true.

## III.    SALE CONTRACT AND LEASE DEFAULT

26.     On or about March 10, 2015, Plaintiff and VRE entered into a Purchase and Sale Agreement (the "Sale Contract"), pursuant to which Plaintiff agreed to buy, and VRE agreed to

SL 1917865.5

sell, the Property subject to the terms and conditions described in that contract. (A true copy of the Sale Contract is appended hereto as Exhibit 3.) The Sale Contract provided for a purchase price of $2,443,000.00, which, upon information and belief, was $1,018,000 (or 71%) more than Verdad and/or VRE paid for the property only a year earlier.

27.    Plaintiff and VRE closed on the purchase and sale of the Property on or about May 1, 2015. At or around that same time, Plaintiff assumed VRE's rights and obligations under VRE's lease with MJC.

28.    Following the closing MJC paid the rent due under the lease for only two months. Thereafter, MJC stated it was unable to pay rent, ceased paying rent and ultimately vacated the premises.

29.    Since then, Plaintiff has been unable to secure a new tenant to operate a KFC business at the Property, and the Property has been dark, generating no rent or other revenue.

30.    At the time of the closing of the Sale Contract, MJC was in default of its obligations under the February 27, 2015 lease to pay property taxes on the Property, and was in arrears for approximately $30,000. VRE was required to pay those tax obligations out of the seller's proceeds payable at closing. Plaintiff did not learn about MJC being in default of its obligations to pay taxes until at or shortly before the time of closing, and Defendants did not earlier disclose that information to Plaintiff.

31.    On or about July 27, 2015, Frontier Star filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. That bankruptcy case remains pending in the United States Bankruptcy Court for the District of Arizona.

32.    Verdad – itself and through several subsidiaries – is a creditor of Frontier Star and received notice of Frontier Star's bankruptcy. Upon information and belief, Verdad and/or VRE

SL 1917865.5

had a close and ongoing business relationship with Frontier Star, FS1 and/or LeVecke as of and prior to early 2015. Counsel for Verdad and VRE stated that those parties had engaged in more than 30 transactions with one another. Upon information and belief, Verdad and VRE knew of Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy, prior to the date of the Sale Contract and/or the date on which VRE and Plaintiff closed on the sale of the Property.

33.    On or about November 17, 2015, FS1 filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. That bankruptcy case remains pending in the United States Bankruptcy Court for the District of Arizona.

34.    On or about January 25, 2016, LeVecke filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. That bankruptcy case remains pending in the United States Bankruptcy Court for the District of Arizona.

35.    At no time prior to the Closing of the Sale Contract did Verdad, VRE, EXP or Tartan disclose to Plaintiff any of the following material facts:

a.    that the February 27, 2015 lease provided for payment of rent at a level substantially higher than the rent the Property was generating prior to VRE's acquisition of it, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

SL 1917865.5

b.      the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c.      the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d.      Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e.      MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease;

f.      the fact that MJC had no track record as a KFC franchisee, and, at the time of various communications, may not even have been an approved KFC franchisee;

g.      the falsity of the information that Defendants did not have unit level sales information relating to the Property, that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiff, and that sales at the Property were up 30% since it was acquired in 2014 and were projected to be more than $1.2 million by the end of 2015 and more than $1.5 million in 2016 and 2017; and/or

h.      the falsity of the information that the ratio of the rent expense to the gross revenues being generated on the property was below 8 percent.

36.     As a direct and proximate result of the foregoing, Plaintiff has suffered substantial losses and damages, including but not limited to lost rents; paying $2,443,000.00 for the Property

SL 1917865.5

when its actual fair market value was approximately $1,000,000 less than that amount; and legal fees and expenses.

37.     The circumstances of this case involving false representations and the resulting sale of a KFC restaurant property to an unsuspecting buyer for an inflated price, by the same seller and the same or similar agents, are not an isolated occurrence.  To the contrary, Plaintiff has knowledge of at least three other similar situations: one involving a property at 10200 S. Halsted Street, in Chicago, Illinois, which is the subject of litigation pending in this Court as *JMO Property, LLC v. VRE Chicago Eleven, LLC, et al.,* Case No. 4:16-cv-00074-A, U.S. District Court for the Northern District of Texas, Forth Worth Division (Hon. John McBryde); another involving a property at 5852 S. Western Ave., in Chicago, Illinois, which is the subject of litigation pending as *Raymond L. Walls, et al. v. VRE Chicago Eleven, LLC, et al.,* Case No. 1:16-cv-04048, U.S. District Court for the Northern District of Illinois; and another involving a property at 7 E. Garfield Blvd., in Chicago, Illinois, sold to Ligon Properties, LLC.

## COUNT I – FRAUDULENT INDUCEMENT-MISREPRESENTATIONS
### (Against Verdad, VRE, EXP and Tartan)

38.     Paragraphs 1 through 37 are incorporated by this reference as though set forth in full herein.

39.     Prior to entering into the Sale Contract, Verdad, VRE, EXP and Tartan, and each of them, made a number of false representations to Plaintiff, in order to induce Plaintiff to enter into the Sale Contract, including but not limited to the following:

a.     the brochure used to market the Property falsely represented that FS1 had substantial financial strength; that, as of 2014, FS1 had a net worth of nearly $70 million; and that, as of 2014, FS1 had an annual operating profit of nearly $15 million;

12

b.    Defendants falsely represented that Frontier Star or FS1 was, and would be, the tenant of the Property; that the tenant of the Property operated 22 KFC restaurants in the Chicago Market; and that the tenant of the Property was one of the largest multi-unit franchise restaurant operators with over 200 locations;

c.    the offering circular for the Property falsely represented that the Property was generating, and would in the future generate, rental income in the amount of $171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year;

d.    Defendants falsely represented that they did not have unit level sales information relating to the Property, that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiff, and that sales at the Property were up 30% since it was acquired in 2014 and were projected to be more than $1.2 million by the end of 2015 and more than $1.5 million in 2016 and 2017; and/or

e.    Defendants falsely represented that the ratio of rent expense to gross revenues at the Property was below 8 percent.

40.    All of the foregoing facts were material to the Sale Contract.

41.    Verdad, VRE, EXP and Tartan, and each of them, made the foregoing false representations knowing the same to be false, or without any proper basis for knowing whether they were true, and with intent to deceive Plaintiff.

42.    Plaintiff relied on the foregoing false representations, her reliance was reasonable, and Plaintiff in fact was deceived by the false representations.

13

43.     As a direct and proximate result of the foregoing, Plaintiff was fraudulently induced to enter into the Sale Contract and purchase the Property.

44.     As a direct and proximate result of the foregoing, Plaintiff has been damaged, and the amount of her damages exceeds $1,000,000.

45.     The actions of Verdad, VRE, EXP and Tartan were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiff's rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiff respectfully requests, pursuant to this Count, that the Court enter judgment in her favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiff her actual damages, in excess of $1,000,000, in an amount to be proven at trial; award to Plaintiff punitive damages from each of the said defendants; award to Plaintiff from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiff from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiff appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT II – FRAUDULENT INDUCEMENT-OMISSIONS
### (Against Verdad, VRE, EXP and Tartan)

46.     Paragraphs 1 through 45 are incorporated by this reference as though set forth in full herein.

47.     Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP and EXP, and each of them, omitted to disclose a number of material facts to

Plaintiff, in order to induce Plaintiff to enter into and close the Sale Contract, including but not limited to the following:

    a.     the February 27, 2015 lease provided for payment of rent at a level substantially higher than the rent the Property was generating prior to VRE's acquisition of it, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

    b.     the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

    c.     the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

    d.     Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

    e.     MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease;

    f.     the fact that MJC had no track record as a KFC franchisee;

g.      financial statements and sales data relating specifically to the Property, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable;

h.      the falsity of the information that Defendants did not have unit level sales information relating to the Property, that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiff, and that sales at the Property were up 30% since it was acquired in 2014 and were projected to be more than $1.2 million by the end of 2015 and more than $1.5 million in 2016 and 2017; and/or

i.      the falsity of the information that the ratio of rent expense to gross revenues at the Property was below 8 percent.

48.     All of the foregoing facts were material to the Sale Contract. Had Plaintiff known of those facts, or any of them, she would not have proceeded with the purchase of the Property.

49.     Verdad, VRE, EXP and Tartan, and each of them, omitted to disclose the foregoing facts with intent to deceive Plaintiff, and Plaintiff thereby was deceived.

50.     Verdad, VRE, EXP and Tartan, and each of them, had a duty to disclose the foregoing facts to Plaintiff because, in the absence of such disclosure, the said defendants' other statements and representations to Plaintiff were misleading and/or untrue, and/or their partial disclosures conveyed a false impression, and because the said defendants had superior knowledge and information concerning the omitted facts.

51.     As a direct and proximate result of the foregoing, Plaintiff was fraudulently induced to enter into the Sale Contract and purchase the Property.

SL 1917865.5

52.     As a direct and proximate result of the foregoing, Plaintiff has been damaged, and the amount of her damages exceeds $1,000,000.

53.     The actions of Verdad, VRE, EXP and Tartan were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiff's rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiff respectfully requests, pursuant to this Count, that the Court enter judgment in her favor on this Count, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiff her actual damages, in excess of $1,000,000, in an amount to be proven at trial; award to Plaintiff punitive damages from each of the said defendants; award to Plaintiff from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiff from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiff appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT III – NEGLIGENT MISREPRESENTATIONS-AFFIRMATIVE STATEMENTS
### (Against Verdad, VRE, EXP and Tartan)

54.     Paragraphs 1 through 53 are incorporated by this reference as though set forth in full herein.

55.     Plaintiff alleges this Count in the alternative to the claims alleged in Counts I and II.

56.     Prior to entering into the Sale Contract, Verdad, VRE, EXP and Tartan, and each of them, made a number of false representations to Plaintiff, which operated to induce Plaintiff to enter into the Sale Contract, including but not limited to the following:

SL 1917865.5

a.      the brochure used to market the Property falsely represented that FS1 had substantial financial strength; that, as of 2014, FS1 had a net worth of nearly $70 million; and that, as of 2014, FS1 had an annual operating profit of nearly $15 million;

b.      Defendants falsely represented that Frontier Star or FS1 was, and would be, the tenant of the Property; that the tenant of the Property operated 22 KFC restaurants in the Chicago Market; and that the tenant of the Property was one of the largest multi-unit franchise restaurant operators with over 200 locations;

c.      the offering circular for the Property falsely represented that the Property was generating, and would in the future generate, rental income in the amount of $171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year;

d.      Defendants falsely represented that they did not have unit level sales information relating to the Property, that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiff, and that sales at the Property were up 30% since it was acquired in 2014 and were projected to be more than $1.2 million by the end of 2015 and more than $1.5 million in 2016 and 2017; and/or

e.      Defendants falsely represented that the ratio of rent expense to gross revenues at the Property was below 8 percent.

57.     All of the foregoing facts were material to the Sale Contract.

58.     Verdad, VRE, EXP and Tartan, and each of them, made these statements to Plaintiff in the course of their business and in a transaction in which they had an interest.

SL 1917865.5

59.     Verdad, VRE, EXP and Tartan, and each of them, failed to take reasonable care to ensure the statements they made were true and sufficiently complete that they would not be misleading, and thus were negligent in making the misrepresentations set forth above.

60.     Plaintiff justifiably relied on the statements by Verdad, VRE, EXP and Tartan, and each of them.

61.     As a direct and proximate result of the foregoing negligent misrepresentations, Plaintiff was damaged, and the amount of her damages exceeds $1,000,000.

WHEREFORE, Plaintiff respectfully requests, pursuant to this Count, that the Court enter judgment in her favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiff her actual damages, in excess of $1,000,000, in an amount to be proven at trial; award to Plaintiff from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiff from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiff appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT IV – NEGLIGENT MISREPRESENTATION-OMISSIONS
### (Against Verdad, VRE, EXP and Tartan)

62.     Paragraphs 1 through 61 are incorporated by this reference as though set forth in full herein.

63.     Plaintiff alleges this Count in the alternative to the claims alleged in Counts I and II.

64.     Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP and Tartan, and each of them, omitted to disclose a number of material facts

SL 1917865.5

to Plaintiff, which operated to induce Plaintiff to enter into and close the Sale Contract, including but not limited to the following:

a.  the February 27, 2015 lease provided for payment of rent at a level substantially higher than the rent the Property was generating prior to VRE's acquisition of it, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b.  the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c.  the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d.  Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e.  MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease;

f.  the fact that MJC had no track record as a KFC franchisee;

SL 1917865.5

g.     financial statements and sales data relating specifically to the Property, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable;

h.     the falsity of the information that Defendants did not have unit level sales information relating to the Property, that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiff, and that sales at the Property were up 30% since it was acquired in 2014 and were projected to be more than $1.2 million by the end of 2015 and more than $1.5 million in 2016 and 2017; and/or

i.     the falsity of the information that the ratio of rent expense to gross revenues at the Property was below 8 percent.

65.     All of the foregoing facts were material to the Sale Contract. Had Plaintiff known of those facts, or any of them, she would not have proceeded with the purchase of the Property.

66.     Verdad, VRE, EXP and Tartan, and each of them, failed to disclose the foregoing facts to Plaintiff in the course of their business and in a transaction in which they had an interest.

67.     Verdad, VRE, EXP and Tartan, and each of them, failed to take reasonable care to ensure the statements they made were true and sufficiently complete that they would not be misleading; additionally, they failed to take reasonable care to ensure they disclosed the foregoing material information of which they had superior knowledge and which was not reasonably discoverable by Plaintiff in the exercise of ordinary due diligence. In each and all of the foregoing respects, Verdad, VRE, EXP and Tartan, and each of them, were thereby negligent.

SL 1917865.5

68.     As a direct and proximate result of the negligent omissions by Verdad, VRE, EXP and Tartan, and each of them, Plaintiff was damaged, and the amount of her damages exceeds $1,000,000.

WHEREFORE, Plaintiff respectfully requests, pursuant to this Count, that the Court enter judgment in her favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiff her actual damages, in excess of $1,000,000, in an amount to be proven at trial; award to Plaintiff from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiff from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiff appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

SL 1917865.5

Respectfully submitted,

Janna Ward Clarke
State Bar No. 20844150
309 West 7th Street, Suite 1100
Fort Worth, TX 76102
(817) 335-1615
(817) 335-1603 (fax)
E-mail:  jwc@bsjpc.com


Gerald P. Greiman, *pro hac vice to be applied for*
Ryan C. Hardy, *pro hac vice to be applied for*
SPENCER FANE LLP
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
(314) 863-7733
(314) 862-4656 (fax)
E-mail:  ggreiman@spencerfane.com
                rhardy@spencerfane.com

*Attorneys for Plaintiff*

SL 1917865.5

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Contract") is made and entered into and is effective as of the __10__ day of March, 2015 (the "Contract Date"), by and between VRE CHICAGO ELEVEN, LLC, a Texas limited liability company ("Seller") and THE CHING FAMILY TRUST B ("Purchaser").

### RECITALS:

A.   Seller is the owner of the Project (as defined below).

B.   Upon the satisfaction of, and subject to, the terms and conditions set forth in this Contract, Seller has agreed to sell the Project to Purchaser, and Purchaser has agreed to purchase the Project from Seller.

### AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants set forth in this Contract, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as set forth below.

### 1.  PURCHASE AND SALE OF THE PROJECT.

Subject to and in accordance with the terms and conditions contained in this Contract, Seller agrees to sell, assign, convey, and transfer to Purchaser in the manner herein provided all of Seller's right, title and interest in and to the following real and personal property (collectively referred to herein as the "Project"), and Purchaser hereby agrees to purchase and accept the Project:

1.1   Land.  Fee Simple Absolute title to that certain real property located at 107 East 95th Street, in the City of Chicago, Cook County, Illinois, which real property is more particularly described in Exhibit 1.1 (the "Land").

1.2   Improvements.  All fixtures and improvements owned by Seller located on the Land (collectively, the "Improvements"), it being understood and agreed, however, that Purchaser shall not have the right, pursuant to this Contract, to purchase any of such fixtures and improvements which are the property of Tenant (defined below) during the term of the Tenant Lease, as hereinafter defined. The Improvements include an existing retail building, all of which is occupied by Frontier Star, LLC, a Delaware limited liability company("Tenant"), operating as a Kentucky Fried Chicken (KFC) restaurant pursuant to the terms of the Tenant Lease.

1.3   Personalty.  All equipment and personal property owned by Seller, if any, which is located on or in the Land or the Improvements (collectively, the "Personalty"), it being understood and agreed that Purchaser shall not have the right, pursuant to this Contract, to purchase any personal property on the Improvements which is the personal property of any tenants and other occupants of the Project during the term of the Tenant Lease.

1.4   Appurtenances.  All rights, privileges and easements appurtenant to the Land, all water, wastewater and other utility rights relating to the Land and any and all easements, rights-of-way and other appurtenances used in connection with the beneficial use and enjoyment of the Land, in each case to the extent assignable (collectively, the "Appurtenances").

1.5   Tenant Lease.  All of Seller's right, title and interest in and to that certain Lease Agreement by and between Seller, as lessor, and Tenant, as lessee dated effective February 27, 2015 (the "Tenant Lease"), covering the Improvements on the Land.

PURCHASE AND SALE AGREEMENT



EXHIBIT
1

Page 1

1.6     Awards.  All right, title and interest to any unpaid insurance claims or proceeds or awards for damages to the Land and/or Improvements, resulting from any casualty or any taking in eminent domain or by reason of change of grade of any street.

1.7     Intangible Property.  Except the name of the Seller or affiliated entities, all of the interest of Seller in any intangible property now or hereafter owned by Seller and used or designed for use in connection with the Land, Improvements and/or Personalty, and any contract or lease rights, licenses, permits, certificates of occupancy, franchises, agreements, utility contracts, unexpired claims, warranties, guaranties and sureties belonging to Seller, or other rights relating to the ownership, development, construction, design, use and operation of the Land and/or Improvements, in each case to the extent assignable (collectively, "Intangible Property").

## 2. INDEPENDENT CONSIDERATION; EARNEST MONEY; CLOSING; DUE DILIGENCE MATERIALS AND INSPECTIONS.

2.1     Independent Consideration.  Purchaser has or will as of the Contract Date deliver to Seller the sum of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00) (the "Independent Consideration") in cash or immediately available funds, in consideration for Seller's entering into this Contract to the exclusion of potential other purchasers and granting Purchaser the rights to inspect and evaluate the Project during the Contingency Period (hereinafter defined).  The Independent Consideration is not refundable to Purchaser under any circumstances, but will be applied to the Purchase Price (hereinafter defined) if Closing (hereinafter defined) occurs.

2.2     Earnest Money.  Within two (2) business days after the Contract Date, Purchaser shall also deliver a deposit to Fidelity National Title Agency, Inc., 850 E. State Highway 114, Suite 200, Attn: Stephanie Kleam; Phone:  817.442.1111;  Fax:  817.442.9997;  E-Mail:  skleam@fidelity-usa.com  ("Title Company"), in the form of a cashier's check made payable to the Title Company or a wire transfer in the amount of SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($75,000.00) (the "Earnest Money").  The Title Company shall retain possession of the Earnest Money until delivery or return thereof is permitted or required under this Contract.  The Earnest Money shall be deposited in an interest bearing account with the interest thereon to be disbursed with the Earnest Money in accordance with the provisions hereof.  If the purchase and sale of the Project shall close pursuant to the terms and provisions of this Contract, the Earnest Money shall be credited against the Purchase Price at Closing.  The timely delivery of the Earnest Money as provided for herein is a condition precedent to Seller's obligations hereunder, and the failure of Purchaser to timely deliver the Earnest Money as provided for herein shall at Seller's option cause this Contract to be terminated, and thereafter neither party shall have any further right or obligation under this Contract unless expressly provided to the contrary in this Contract.

2.3     Due Diligence Materials.  Within five (5) days after the Contract Date, Seller shall deliver to Purchaser copies of various materials relating to the Project (the "Due Diligence Materials").  The Due Diligence Materials to be delivered to Purchaser are listed on Exhibit 2.3 attached hereto.  Purchaser agrees not to disclose the Due Diligence Materials to anyone other than its lenders and its agents and attorneys who are directly involved in conducting due diligence with respect to the Project and then only if Purchaser has obtained the agreement of such lenders, agents and attorneys to keep the Due Diligence Materials strictly confidential.  Upon termination of this Contract for any reason, the Due Diligence Materials (together with all copies thereof) shall be promptly returned to Seller to the extent Purchaser has made or received copies thereof.  This obligation survives the termination of this Contract.  IT IS ACKNOWLEDGED THAT THE DUE DILIGENCE MATERIALS INCLUDE REPORTS, INVESTIGATIONS, FINDINGS, ANALYSES, CONCLUSIONS, DATA AND OTHER

INFORMATION WHICH MAY BE OR HAVE BEEN PREPARED BY THIRD PARTIES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, PURCHASER AGREES THAT: (A) SELLER HAS NOT MADE, AND SHALL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION CONSTITUTING THE DUE DILIGENCE MATERIALS OR THE CONCLUSIONS CONTAINED THEREIN OR THE QUALIFICATIONS OF THE PERSONS WHO HAVE PREPARED THE DUE DILIGENCE MATERIALS, OR ANY PART THEREOF, AND (B) PURCHASER'S RELIANCE ON THE DUE DILIGENCE MATERIALS IN DETERMINING WHETHER TO PURCHASE THE PROJECT SHALL BE AT PURCHASER'S OWN RISK AND SELLER SHALL HAVE NO LIABILITY THEREFOR  THE DUE DILIGENCE MATERIALS ARE DELIVERED OR MADE AVAILABLE WITHOUT REPRESENTATION OR WARRANTY BY SELLER (EXPRESS OR IMPLIED).

2.4     Inspections; Indemnity; Insurance.

2.4.1   Inspections.  Purchaser and its employees and agents shall have the right and permission from and after the Contract Date through Closing to enter upon the Project or any part thereof at all reasonable times upon at least one (1) business day advance notice by Purchaser to Seller and Tenant, in a manner not to disturb Tenant or other occupants of the Project nor damage or injure the Project, to inspect all aspects of the Project, at Purchaser's sole risk, cost and expense, and to make such physical inspections, studies and tests of the Project which Purchaser deems reasonably necessary or advisable.  Any entry by Purchaser also shall be in compliance with the terms of the Tenant Lease.  Purchaser shall not have the right to interview Tenant or its employees prior to Closing without the express consent of Seller.  Any testing that requires a material invasion of the Land or Improvements, including a Phase II environmental site assessment, shall require Seller's written consent, which consent may be withheld in Seller's sole discretion.

Purchaser agrees that it will not reveal to any third party not approved by Seller the results of its inspections or tests, unless required by law, and to provide Seller with copies of any inspection or test report received by Purchaser.

2.4.2   Indemnity.  Purchaser shall INDEMNIFY AND HOLD HARMLESS Seller, its partners, and it officers, directors, employees and agents from all claims, liability and expense (including attorneys' fees) arising as a result of any activities of Purchaser or its employees, agents, contractors or representatives on the Project in connection with such inspections, studies and tests, and Purchaser shall restore any portion of the Land or Improvements disturbed by any such inspections, studies and tests to the condition existing immediately prior to such operation. The foregoing indemnification obligation of Purchaser shall survive Closing or any termination of this Contract.

2.4.3   Insurance.  Without limiting the generality of the foregoing indemnity, Purchaser shall maintain or cause its contractors to maintain commercial general liability insurance in amounts not less than $1,000,000.00 per occurrence during all periods when Purchaser is conducting inspections of the Project.  Purchaser shall cause Seller to be named as an additional insured on such insurance policy and shall provide Seller with evidence of such insurance prior to entering the Project.

2.5     Survey.  Within five (5) days after the Contract Date, Seller shall deliver to Purchaser the most recent boundary survey of the Land in Seller's possession (the "Survey").

2.6     Title Commitment.

    2.6.1    Title Commitment.  Within fifteen (15) days after the Contract Date, Seller shall cause the Title Company to deliver to Purchaser a current commitment for the issuance of an owner policy of title insurance (the "Title Commitment"), including true, correct and, to the extent reasonably available from the public records, legible copies of all instruments referred to in the Title Commitment as conditions or exceptions to title to the Land and the Improvements.

    2.6.2    Title/Survey Review Period.  All items shown on the Title Commitment and the Survey not objected to by Purchaser by written notice to Seller within ten (10) days after the receipt by Purchaser of the Title Commitment and the Survey (the "Title/Survey Review Period"), shall be deemed to be "Permitted Exceptions." Should Purchaser make written objection to Seller within the Title/Survey Review Period to exceptions, defects or conditions shown on the Title Commitment and/or the Survey which materially and adversely affect the use and operation of the Project (collectively, "Purchaser's Objections"), Seller may, but shall not be obligated, to use good faith efforts to cure such Purchaser's Objections prior to the later to occur of the expiration of the Contingency Period or twenty (20) days after Seller's receipt of written notice of Purchaser's Objections; provided, however, that it is expressly understood and agreed that Seller shall have no obligation to expend funds or institute any litigation in effecting such curative matters.  In no event may Purchaser include any of the standard printed exceptions set forth in the Title Commitment in Purchaser's Objections, all of which shall be deemed Permitted Exceptions.  If Seller does not cure any or all of Purchaser's Objections prior to the later to occur of the expiration of the Contingency Period or twenty (20) days after Seller's receipt of written notice of Purchaser's Objections, then prior to the later to occur of the expiration of the Contingency Period or said twenty (20)-day period, Purchaser, as its sole remedies, either may (i) terminate this Contract by giving written termination notice to Seller, or (ii) waive any uncured Purchaser Objection, and Purchaser's failure to timely terminate this Contract as a result of Seller's failure to cure Purchaser's Objections shall be deemed an election of remedy (ii).

    2.6.3    Revised Title Commitment.  With respect to matters, defects, conditions or exceptions first brought to the attention of Purchaser in a revised title commitment delivered to Purchaser on or after the date of notice of Purchaser's Objections are delivered in accordance with the preceding paragraph, Purchaser shall have a period of five (5) days following delivery of such revised title commitment to notify Seller in writing of any additional Purchaser's Objections regarding such new matters.  Seller shall, within five (5) business days after receipt of Purchaser's notice to Seller of the additional Purchaser's Objections, notify Purchaser in writing that:  (i) Seller will cure all or certain of the additional Purchaser's Objections as of or prior to Closing, or (ii) Seller will not cure all or certain of the additional Purchaser's Objections.  In the event Seller fails to deliver the foregoing notice with respect to all or any of the additional Purchaser's Objections, Seller shall be deemed to have elected option (ii) above with respect to any such Purchaser's Objections. If Seller elects or is deemed to have elected not to cure any or all of the additional Purchaser's Objections, Purchaser may, as Purchaser's sole and exclusive remedies, (x) waive said Purchaser's Objections, (y) by written notice to Seller given within five (5) days after the expiration of Seller's cure period described above, terminate this Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money, and Seller and Purchaser shall have no further obligations hereunder (except as otherwise expressly provided herein) or (z) elect to cure said additional Purchaser's Objections at Purchaser's expense (subject to Purchaser's right to deduct from the Purchase Price the cost of the cure of any Curable Matters (hereinafter defined) that Purchaser elects to cure after Seller's failure to cure such Curable Matter).  Failure by Purchaser to terminate this Contract by notice to Seller within such period

shall be deemed a waiver by Purchaser of any Purchaser's Objections previously raised and not cured.

2.6.4   Curable Matters.  Notwithstanding anything in this Section 2.6 to the contrary, Seller shall be obligated to cure and/or satisfy (a) any mortgage liens or mechanics and materialman's liens not caused by the acts or omissions of Purchaser or its agents against the Project, (b) any consensual liens or encumbrances agreed to by Seller without Purchaser's consent on or after the Contract Date and (c) any real estate taxes, personal property taxes, or special assessments due and payable prior to Closing (collectively, the "Curable Matters").  Insuring over or bonding around mechanics', materialmen's and judgment liens in a manner that permits the Title Company to issue the Title Policy (hereinafter defined) without exceptions for such liens shall be deemed satisfactory for compliance with this Section 2.6.4.  Except for the Curable Matters and the Purchaser's Objections that Seller cures or agrees to cure on or prior to the Closing, all exceptions to title shown by the Title commitment, any revised title commitment, the Survey and any encumbrance arising from the acts of Purchaser shall be Permitted Exceptions for all purposes hereunder.

2.7   Contingency Period.  Purchaser's obligations under this Contract shall be conditioned upon the Due Diligence Materials, the Title Commitment, the Survey, and the Project and all aspects thereof, including by way of illustration all physical and environmental matters relating to the Project, being acceptable to Purchaser in its sole discretion; provided, however, there shall be no contingency for Purchaser's ability to obtain financing for the acquisition of the Project. Purchaser, at its election and in its sole discretion, may terminate this Contract by giving written notice thereof to Seller at any time prior to 5:00 p.m. Fort Worth, Texas time on the date which is thirty (30) days following the Contract Date (the "Contingency Period"), in which event Purchaser shall thereafter be entitled to obtain prompt return of the Earnest Money, and neither party shall have any further obligation under this Contract, except as may be expressly provided to the contrary herein.  In the event Purchaser fails to terminate this Contract as provided in the immediately preceding sentence, Purchaser shall be deemed to have waived its right to terminate this Contract under this Section 2.7 and to have accepted the Land, the Improvements, the Title Commitment (as such may have been modified but subject to Purchaser's rights under Section 2.6.3), and the Survey; and the Earnest Money will become non-refundable (except in the event this Agreement terminates as a result of Seller's default of the terms hereof or Seller fails to satisfy a contingency provided herein) but applicable to the Purchase Price at Closing.  Thereafter, Purchaser shall have no further right to terminate this Contract except as specifically provided elsewhere herein, and Purchaser shall be deemed to have accepted all then-existing matters relating to the Project.

## 3.  PURCHASE PRICE.

The "Purchase Price" for the Project shall be TWO MILLION FOUR HUNDRED FORTY-THREE THOUSAND AND NO/100 DOLLARS ($2,443,000.00), payable in all cash or other immediately available funds at the Closing, payable pursuant to the terms and conditions contained in this Contract, but subject to prorations as provided below.

## 4.  PRORATIONS.

The following items shall be prorated as of the Closing Date and such prorations shall be reflected on the settlement statements prepared by the Title Company on the Closing Date and shall serve to adjust the Purchase Price.  Such prorations shall be made on the basis of a 365-day year, as of 11:59 p.m. on the day preceding the Closing Date.

4.1   Revenues.  All rentals, receipts and other revenues from the Project, if any, which have been actually received by Seller and which are allocable to the period from and after the Closing Date shall be

Page 5

credited to Purchaser.  Purchaser shall be entitled to collect all rentals, receipts and other revenues from the Project which are delinquent or due on or after the Closing Date.  All rentals, receipts, and other revenues of any kind whatsoever (together, "Revenues") from the Project collected by Purchaser shall be credited: (a) if specifically identified by reference to invoice or month, to such invoice or month; and (b) if not so specifically identified, first to current Revenues not delinquent, and second to delinquent Revenues, in the inverse order of delinquency.  All Revenues which relate to the month in which the Closing Date occurs shall be credited first to Revenues for the month in which the Closing Date occurs, and second to delinquent Revenues, in the inverse order of delinquency.  Any such delinquent Revenues when applied as provided herein which relate in whole or in part to any period prior to the Closing Date shall be remitted by Purchaser to Seller when collected by Purchaser (net only of any reasonable collection expenses actually incurred by Purchaser).  Any such delinquent Revenues when applied as provided herein, which relate in whole or part to any period on or subsequent to the Closing Date shall be remitted by Seller to Purchaser when and if collected by Seller (net only of any reasonable collection expenses actually incurred by Seller).  Seller shall have the right to enforce and collect any Revenues that are attributable to periods before the Closing Date by any means other than exercising termination or termination of possession rights or other rights under the Tenant Lease (except that Seller shall at all time have the right to bring a suit or suits for damages to collect any Revenues), and Purchaser shall reasonably cooperate in such enforcement and collection efforts at no cost to Purchaser other than any attorneys' fees incurred by Purchaser.

4.2     Property Taxes.  Seller shall be responsible for all ad valorem taxes and assessments, general and special, with respect to the Project for periods prior to the calendar year containing the Closing Date.  Ad valorem taxes and assessments, general and special, with respect to the Project for the calendar year containing the Closing Date shall be prorated between Seller and Purchaser at Closing, as of the Closing Date subject to the terms of the Tenant Lease.  All ad valorem tax prorations shall be based on tax rates and assessments for the calendar year containing the Closing Date unless such rates and/or assessments are unavailable.  If either the tax rates or the tax assessments for the Project for the calendar year containing the Closing Date are not available, then such proration shall be made based on the tax rates and assessments for the prior year (or if only the assessed value for the calendar year containing the Closing Date is known, then based on the prior year's tax rates and the current year's assessed value), and shall be adjusted by cash settlement between Seller and Purchaser according to terms of the Tenant Lease after the Closing as soon as such rates and assessments for the year of the Closing are available. The provisions of this Section 4.2 shall survive Closing.

4.3     Security Deposit.  All security and other deposits, if any, including any accrued interest thereon, if such interest is required to be remitted to Tenant pursuant to the Tenant Lease, held by Seller on the Closing Date on behalf of Tenant under the Tenant Lease shall be credited to Purchaser.

4.4     Utility Charges.  Final meter readings on all utilities charged to the Project and not payable by Tenant shall be made as of the day preceding the Closing Date.  Seller shall arrange for and pay for final billings of utilities to the day preceding the Closing Date. Consistent with the terms of the Tenant Lease, Tenant shall be responsible for any and all utility billings on or after the closing date.

4.5     Service Contracts.  Seller shall pay (or be charged by a proration for) all charges due pursuant to any service contracts affecting the Project, if any, which are allocable to the period prior to the Closing Date, and consistent with the terms of the Tenant Lease, Tenant shall be responsible for any and all service contract charges on or after the closing date..  Prepaid charges allocable to the period from and after the Closing Date in connection with such contracts shall be credited to Seller at Closing.  Accrued and unpaid charges allocable to the period prior to the Closing Date in connection with such contracts shall be credited to Purchaser at Closing.  The provisions of this Section 4.5 shall survive Closing.

4.6     Licenses and Permits. Prepaid charges allocated to the period from and after the Closing Date in connection with any licenses or permits for the Project, if any, shall be credited to Seller at Closing. Accrued and unpaid charges allocable to the period prior to the Closing Date in connection with any such licenses or permits, if any, shall be credited to Purchaser at Closing.

4.7     Operating Expenses. The Project is being sold as an Absolute Net Lease property transaction and all terms relating to any and all operating expenses shall be consistent with the terms of the Tenant Lease dated February 27, 2015. Except as otherwise expressly provided herein to the contrary and except to the extent the responsibility of Tenant under the Tenant Lease, Seller shall be responsible for and bear all operating expenses for the Project accrued for the period prior to the Closing Date and Tenant shall be responsible for and bear all operating expenses of the Project accrued for the period on and after the Closing Date. Prorations of items under Sections 4.5 and 4.6, shall be made at Closing on the best information available with an adjustment and reconciliation to the extent necessary on a mutually agreed date within ninety (90) days following the Closing Date, with payment from one party to the other (to the extent required) to be made within thirty (30) days following reconciliation. Such prorations, as adjusted as of the ninetieth (90th) day following the Closing Date, shall be considered final and binding for all purposes absent material mistake of fact. To the extent that the Tenant Lease provides for any adjustment of previously paid estimated amounts of real estate tax or operating expense reimbursements on a date subsequent to the Closing Date, Seller shall be entitled to receive, or shall be responsible to pay, as the case may be (when such amounts are actually received or payable by Purchaser), Seller's pro-rata share of any such adjusted amounts that are applicable to periods ending prior to the Closing Date. After Closing, Seller agrees to reasonably cooperate with Purchaser in providing Purchaser access to Seller's books and records relating to such adjustments under the Tenant Lease so that Purchaser may adequately perform such adjustments.

The provisions of this Section 4 shall survive Closing.

5.    **CONDITIONS PRECEDENT TO CLOSING.**

5.1     Purchaser's Conditions to Closing. The obligation of Purchaser to purchase the Project from Seller, and to perform the obligations required to be performed by Purchaser at the Closing, are subject to each of the following conditions ("**Purchaser's Conditions**"):

     5.1.1    Closing Documents. Seller shall have tendered at Closing all Closing Documents (as hereinafter defined) to which Seller is a party.

     5.1.2    Compliance with Agreement. Seller shall have performed and complied in all material respects with its covenants and obligations under this Contract such that any default or failure of performance of Seller as to which Purchaser has delivered written notice to Seller shall be cured in all material respects prior to or at Closing.

     5.1.3    Representations and Warranties. All of Seller's representations and warranties under Section 8.2 are true and correct in all material respects as of Closing; provided, however, it shall not be a condition to Purchaser's obligations hereunder if any items which may indicate Seller's representations and warranties under Section 8.2 are not true and correct have been (i) disclosed to Purchaser prior to the Closing Date, or (ii) discovered by Purchaser during the Contingency Period and Purchaser has elected not to terminate this Contract due to such item(s) prior to the expiration of the Contingency Period.

     5.1.4    Title. The Title Company shall be prepared to issue an owner's policy of title insurance in the amount of the Purchase Price (the "**Title Policy**") insuring Purchaser's fee simple title to the

Land and the Improvements showing no exceptions other than the Permitted Exceptions and reservation of the Mineral Estate.

If any of the Purchaser's Conditions have not occurred or been satisfied within the time periods and in accordance with the terms set forth herein, then Purchaser shall have the right to terminate this Contract by written notice to Seller, in which event the Earnest Money shall be returned to Purchaser, all obligations of the parties hereto shall thereupon cease (except as may be expressly provided to the contrary herein) and this Contract shall thereafter be of no further force and effect, unless such failure of the condition constitutes a default on the part of Purchaser under any other provision of this Contract.

5.2     Closing Conditions for Seller.  Seller's obligations to close on the Closing Date are conditional and contingent on the following, unless waived in writing by Seller (the "**Seller's Conditions**"):

     5.2.1     Purchase Price.  Purchaser shall have tendered the Purchase Price into escrow with the Title Company.

     5.2.2     Closing Documents.  Purchaser shall have tendered at Closing all Closing Documents to which Purchaser is a party.

     5.2.3     Compliance with Agreement.  Purchaser shall have performed and complied with its monetary obligations under this Contract such that any default or failure of performance of Purchaser as to which Seller has delivered written notice to Purchaser shall be timely cured prior to or at Closing and Purchaser shall have performed and complied in all material respects with its other obligations under this Contract such that any default or failure of performance of Purchaser as to which Seller has delivered written notice to Purchaser shall be timely cured in all material respects prior to or at Closing.

     5.2.4     Representations and Warranties.  All of Purchaser's representations and warranties under Section 9.1 and Section 9.2 are true and correct in all respects as of Closing.

If any of the Seller's Conditions have not occurred or been satisfied within the time periods and in accordance with the terms set forth herein, then Seller shall have the right to terminate this Contract by written notice to Purchaser, in which event the Earnest Money shall be paid to Seller, all obligations of the parties hereto shall thereupon cease (except as may be expressly provided to the contrary herein) and this Contract shall thereafter be of no further force and effect, unless such failure of the condition constitutes a default on the part of Seller under any other provision of this Contract.

6.    **CLOSING DOCUMENTS.**

On the Closing Date, (or such earlier date as expressly hereinbelow provided), Seller (and Purchaser where applicable) shall deliver, or cause to be delivered, to the Title Company the following fully executed documents and/or items, acknowledged where appropriate(collectively referred to herein as the "**Closing Documents**"):

6.1     Deed.  A SpecialWarranty Deed ("Deed") in the form attached hereto as Exhibit 6.1 conveying the Land, the Improvements, and the Appurtenances to Purchaser, subject only to current, non-delinquent real property taxes and assessments.,

6.2     Bill of Sale.  A duly executed Bill of Sale in the form attached hereto as Exhibit 6.2 conveying title to the Personalty to Purchaser and assigning to Purchaser the Intangible Property and all of Seller's interest in the Service Contracts, together with an assumption thereof by Purchaser of all obligations accruing thereunder from and after the Closing Date.  The Service Contracts, if any, in Seller's possession will be delivered to Purchaser immediately after Closing.

6.3     <u>Assignment and Assumption of Lease</u>. An Assignment and Assumption of Lease in the form attached hereto as <u>Exhibit 6.3</u> assigning to Purchaser all of Seller's (or Seller's affiliate's) interest as landlord in the Tenant Lease together with an assumption thereof by Purchaser of all obligations accruing from and after the Closing Date. The Tenant Lease in Seller's possession will be delivered to Purchaser immediately after the Closing.

6.4     <u>Tenant Notice</u>. Notice to Tenant under the Tenant Lease in the form attached hereto as <u>Exhibit 6.4</u> informing Tenant of the sale of the Project to Purchaser.

6.5     <u>Settlement Statement</u>. A settlement statement prepared by the Title Company and acceptable to Purchaser and Seller showing all cash receipts and disbursements to be made by the Title Company on the Closing Date.

6.6     <u>Non-Foreign Status Affidavit</u>. An Affidavit of Non-Foreign Status executed by Seller in the form of that attached hereto as <u>Exhibit 6.6</u>.

6.7     <u>Other Documents</u>. Other certificates and documents that are reasonably acceptable to the signing party and are customarily required to effect the closing of the sale of the Project and related transactions contemplated by this Contract.

Purchaser shall execute and acknowledge the assignment documents tendered by Seller with respect to the Tenant Lease, the Bill of Sale and other documents requiring execution by Purchaser as set forth in Sections 6.1 - 6.7 above.

7. **CLOSING.**

7.1     <u>Closing</u>. This transaction shall close, as evidenced by recordation of the Deed and delivery of the Purchase Price (net of prorations and Seller's share of closing costs pursuant to this Contract) (the "**Closing**"), on or before the date that is fifteen (15) days after the expiration of the Contingency Period (or such earlier date as both parties may mutually agree in writing) (the "**Closing Date**") (provided that if such date is not a business day in Tarrant County, Texas, the Closing shall be held on the next business day thereafter).

7.2     <u>Place</u>. The Closing shall take place through escrow on the Closing Date in the offices of the Title Company, or such other office as is reasonably acceptable to the parties. Neither party shall be required to attend the Closing in person. Upon the completion of the Closing, the parties shall instruct the Title Company to record the Deed in the appropriate land records (provided that Title Company has committed to deliver the Title Policy) to effect the transfer and conveyance of the Project to Purchaser. Upon such recording and agreement to deliver the Title Policy as described in this Contract: (a) the parties shall cause the Title Company to disburse funds to Seller in the amount of the Purchase Price (subject to the prorations provided for herein and less Seller's share of closing costs provided for herein) and (b) the parties shall cause the Title Company to deliver all documents executed in accordance with this Contract to the parties in accordance with written instructions received by the parties.

7.3     <u>Payment of Purchase Price</u>. Purchaser shall deliver to the Title Company on the Closing Date immediately available funds in the amount of the Purchase Price plus any prorations credited to Seller, costs and expenses hereunder payable by Purchaser, and less the amount of the Independent Consideration and the Earnest Money (and any interest thereon) and any costs payable by Seller and prorations credited to Purchaser. The net amount of the Purchase Price, including the Earnest Money, due to Seller as shown on the settlement statement approved by Seller shall be paid to Seller on the Closing Date.

7.4    <u>Possession</u>. Possession of the Project shall be delivered to Purchaser on the Closing Date, subject only to the rights of Tenant under the Tenant Lease and possessory rights of other parties contained in the Permitted Exceptions.

7.5    <u>Closing Costs</u>. Seller shall pay at Closing the premium for the Standard Owner's Title Policy (excluding the premium for any extended coverage and endorsements, if Purchaser requests same, which shall be the responsibility of Purchaser) and one-half of any escrow fees. Purchaser shall pay for one-half of any escrow fees, all costs associated with any financing, the portion of the premium for any endorsements Purchaser desires to obtain to the Title Policy, any costs to update the Survey, the costs of all appraisals, engineering and environmental reports and feasibility and market studies which it may obtain, warranty transfer fees, transfer and/or documentary stamp taxes, and recording fees for the Deed and assignments to be delivered at Closing. Seller and Purchaser shall each be responsible for paying their respective legal fees and costs.

7.6    <u>Brokerage Commissions</u>. Each party shall pay any brokerage commissions due as provided in Section 13 below.

## 8. COVENANTS, REPRESENTATIONS AND WARRANTIES OF SELLER.

8.1    <u>Seller's Covenants</u>. Seller hereby covenants and agrees as follows:

    8.1.1    <u>Insurance</u>. At all times from the date hereof to the date preceding the Closing Date, Seller shall cause to be maintained in force, fire and extended coverage insurance and commercial general liability insurance upon the Project in amounts not less than the amounts of the insurance coverage on the Project on the Contract Date.

    8.1.2    <u>Operation and Maintenance</u>. At all times from the Contract Date to the day immediately before the Closing Date, Seller shall operate and maintain the Project in substantially the same manner as it is now operated and maintained, and Seller shall maintain the physical condition of the Project in substantially its current condition, reasonable and ordinary wear and tear and damage by Purchaser and its agents and by fire and casualty excepted.

    8.1.3    <u>Personalty</u>. Seller shall not transfer nor remove any Personalty that is material to the operation or value of the Project from the Project subsequent to the Contract Date unless Seller replaces the same prior to the Closing Date with Personalty of equivalent or better utility and quality to the items replaced.

    8.1.4    <u>Title</u>. From and after the Contract Date, Seller shall not further encumber the Project in any consensual manner without the written consent of Purchaser, and in all events Seller shall not place any further monetary liens on the Project except those arising by operation of law.

    8.1.5    <u>Copies of Material Notices</u>. Seller shall provide to Purchaser promptly following Seller's receipt (i) any written notices of material default or alleged material default under the Tenant Lease or by any party under any of the Service Contracts delivered or received by Seller from and after the Contract Date and (ii) any written notices with respect to the Project received by Seller from and after the Contract Date.

    8.1.6    <u>Service Contracts</u>. Seller shall not enter into any new service contracts affecting the Project without Purchaser's prior written approval, which shall not be unreasonably withheld or delayed.

8.1.7   Tenant Lease.   From and after the expiration of the Contingency Period, Seller shall not terminate or materially modify the Tenant Lease or enter into any new leases without the prior written consent of Purchaser, not to be unreasonably withheld or delayed except (a) as may be required under the terms of the Tenant Lease, or (b) with respect to termination, in the event of a default by the tenant thereunder.  Seller shall not grant any consent to any assignment or sublease under any Lease unless, in Seller's good faith judgment, it is obligated to grant such consent.  Seller shall comply in all material respects with the obligations of the landlord under the Tenant Lease.

8.1.8   Estoppel Certificate. No later than five (5) days prior to the Closing Date, Seller will cause Tenant to deliver to Purchaser for its benefit an executed Estoppel Certificate in the form substantially similar to that attached hereto as Exhibit 8.1.8.  The Closing Date may be extended as necessary to comply with this provision.

8.2   Seller's Representations and Warranties.   Seller hereby represents and warrants to Purchaser the following as of the Contract Date:

8.2.1   Company and Authorization Matters.   Seller is a limited liability company duly organized and validly existing under the laws of the State of Texas.  Seller is in good standing in Texas and is authorized to transact business in Texas.  Seller has full power and authority to execute and deliver this Contract and perform all of its obligations under this Contract.  All consents, authorizations and approvals which may be required in order for Seller to enter into this Contract or consummate the transactions contemplated hereby have been obtained.  The person executing this Contract on behalf of Seller has been duly authorized and empowered to bind Seller to this Contract.

8.2.2   No Conflict with or Breach of Other Agreements.   Neither the execution and delivery of this Contract, nor the incurrence of the obligations herein set forth, nor the consummation of the transactions provided for herein, nor compliance with the terms of this Contract, conflict with or result in a breach of any of the terms, conditions, or provisions of, or constitute a default under, any bond, note, or other evidence of indebtedness, or any indenture, mortgage, deed of trust, loan agreement, lease, or other material agreement or instrument to which Seller is a party or by which any of the Project may be bound.

8.2.3   No Bankruptcy, Insolvency or Reorganization Proceedings.   Seller has not filed any assignments for the benefit of creditors, insolvency, bankruptcy or reorganization proceedings and no such proceedings have been filed against Seller.

8.2.4   Litigation.   To the best of Seller's current, actual knowledge, there is no pending litigation or other proceeding against Seller relating to the Project, including without limitation any condemnation action.

8.2.5   No Pending Sale Contracts.   Except for this Contract, Seller has not entered into any other currently effective agreements for the sale of the Project.

8.2.6   Not a Foreign Person.   Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

8.3   Survival.   The representations and warranties of Seller contained in this Contract shall survive the Closing Date and the recordation of the Deed for a period of six (6) months, at which time they will be deemed to be merged into and superseded by the Closing Documents, except to the extent written notice

of specific claims have been delivered by Purchaser to Seller prior to the expiration of such six month period.

8.4    <u>Limitations</u>. Notwithstanding anything in this Contract to the contrary, Seller's liability for breaches of the foregoing covenants, representations and warranties is subject to the following limitations:

    8.4.1    <u>Claim Must be Brought Within Six Months</u>. Any claim by Purchaser against Seller for a breach of a covenant, representation or warranty must be brought within six months following the Closing Date.

    8.4.2    <u>No Claim for Breach of Representation as to which Purchaser has Actual Knowledge</u>. Purchaser shall have no claim for any breach of a representation or warranty by Seller as to which Purchaser has knowledge of the untruth or inaccuracy thereof on the Contract Date or unless Purchaser asserts such claim prior to Closing.

    8.4.3    <u>Breach of Covenant as to which Purchaser has Actual Knowledge</u>. Purchaser shall have no claim for any breach of a covenant by Seller as to which Purchaser has actual knowledge prior to Closing.

    8.4.4    <u>No Liability for Consequential or Punitive Damages</u>. Seller shall never be liable to the Purchaser under this Contract for lost profits or other Special, incidental or consequential damages or for punitive or exemplary damages.

## 9. PURCHASER'S REPRESENTATIONS AND WARRANTIES.

Purchaser hereby represents and warrants to Seller the following as of the Contract Date:

9.1    <u>No Conflict with or Breach of Other Agreements</u>. Neither the execution and delivery of this Contract, nor the incurrence of the obligations herein set forth, nor the consummation of the transactions provided for herein, nor compliance with the terms of this Contract, conflict with or result in a breach of any of the terms, conditions, or provisions of, or constitute a default under, any bond, note, or other evidence of indebtedness, or any indenture, mortgage, deed of trust, loan agreement, lease, or other material agreement or instrument to which Purchaser is a party.

9.2    <u>Survival</u>. The representations and warranties of Purchaser shall survive the Closing Date and the recordation of the Deed for a period of six (6) months, except to the extent written notice of specific claims have been delivered by Seller to Purchaser prior to the expiration of such six-month period.

## 10. CONDITION OF THE PROJECT.

10.1    <u>As Is Conveyance</u>. EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 8.2 OF THIS CONTRACT, PURCHASER ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER BY SELLER OR ANY AGENT OR EMPLOYEE THEREOF REGARDING THE PROJECT, INCLUDING, WITHOUT LIMITATION, ITS PHYSICAL CONDITION, ITS SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS COMPLIANCE WITH LAWS, INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS, OR THE PRESENCE OR ABSENCE OF CHEMICALS, TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES THEREUPON, AND SELLER EXPRESSLY DISCLAIMS ANY AND ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, EXCEPT FOR ANY LIMITED WARRANTIES CONTAINED HEREIN AND THE SPECIAL WARRANTY OF TITLE TO BE CONTAINED IN THE DEED TO BE DELIVERED AT THE CLOSING. PURCHASER SHALL ACCEPT THE PROJECT IN ITS "AS IS",

Page 12

"WHERE IS", "WITH ALL FAULTS" CONDITION, AND SELLER HEREBY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXPRESS OR IMPLIED.   AFTER CLOSING, SELLER SHALL BE UNDER NO OBLIGATION WHATSOEVER TO UNDERTAKE ANY REPAIR, ALTERATION, REMEDIATION OR OTHER WORK OF ANY KIND WITH RESPECT TO ANY PORTION OF THE PROJECT.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS CONTRACT OR ANY CLOSING DOCUMENTS, SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR OTHER INFORMATION DELIVERED BY SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.

PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED REAL ESTATE INVESTOR WHO SHALL HAVE HAD, AS OF THE CLOSING DATE, OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AGREEMENTS, STUDIES AND TESTS RELATING TO THE PROJECT THAT PURCHASER ELECTS TO CONDUCT, AND CONDUCT A COMPLETE AND THOROUGH INSPECTION, ANALYSIS AND EVALUATION OF THE PROJECT, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL ISSUES, IF ANY, AND SHALL CONDUCT SUCH TESTS, PRIOR TO THE CLOSING DATE, AND RECEIVE AND REVIEW SUCH INFORMATION AS PURCHASER SHALL REQUIRE IN THE COURSE OF ITS INVESTIGATION.

PURCHASER SHALL UNDERTAKE SUCH INVESTIGATION AS SHALL BE REQUIRED TO MAKE PURCHASER FULLY AWARE OF THE CONDITION OF THE PROJECT, INCLUDING THE ENVIRONMENTAL CONDITION OF THE LAND, AS WELL AS ALL FACTS, CIRCUMSTANCES AND INFORMATION WHICH MAY AFFECT THE USE AND OPERATION OF THE PROJECT, AND PURCHASER COVENANTS AND WARRANTS TO SELLER THAT PURCHASER SHALL RELY, EXCEPT TO THE EXTENT OF SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED HEREUNDER, OR IN ANY CLOSING DOCUMENTS, SOLELY ON PURCHASER'S OWN DUE DILIGENCE INVESTIGATION IN DETERMINING TO PURCHASE THE PROJECT.   NOTWITHSTANDING THE ABOVE, EXCEPT TO ANY INFORMATION DISCLOSED TO PURCHASER IN THE DUE DILIGENCE MATERIALS, TO THE BEST OF SELLER'S ACTUAL KNOWLEDGE, SELLER IS UNAWARE OF ANY EXISTING MATERIAL ENVIRONMENTAL OR OTHER LEGAL VIOLATIONS WHICH WOULD BAR THE OPERATION OF A RETAIL RESTAURANT.

THE PROVISIONS OF THIS SECTION 10.1 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT WHETHER OR NOT INCORPORATED INTO THE DEED TO BE DELIVERED AT CLOSING.

10.2   Waiver and Release.  As a material inducement to Seller to enter into the Contract, and with the exception of those remedies expressly provided in this Contract with respect to a breach by Seller of its express representations and warranties set forth herein, effective as of the Closing, Purchaser, for itself and on behalf of its successors and assigns, hereby irrevocably and unconditionally waives, releases, acquits, compromises with and forever discharges the Seller and each of the Seller's predecessors, successors, assigns, agents, partners, directors, officers, employees, insurance companies, representatives, attorneys, divisions, subsidiaries, affiliates (and partners, agents, directors, officers, employees, representatives and attorneys of such parent companies, divisions, subsidiaries and affiliates), and all persons acting by, through, under or in concert with any of them (collectively "Released Parties"), from and for all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorney's fees and costs actually incurred) of any nature whatsoever, known or

unknown, suspected or unsuspected, arising in connection with the Project, whether prior to or after the Closing, including, but not limited to claims under any federal, state or local laws, including, without limitation, Environmental Laws (as defined below), which Purchaser now or in the future has, owns or holds, or claims to have, own or hold, or claimed to have, own or hold against any of the Released Parties. As used herein, the term **"Environmental Laws"** means any federal, state or local statute, law, rule, regulation, ordinance or code in effect and applicable to the Project on the Contract Date, and any judicial or administrative order, consent decree, judgment or directive in effect and applicable to the Project on the Contract Date, relating to the protection of environment, natural resources, hazardous substances, solid waste, petroleum hydrocarbons or refined products, including without limitation, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et. seq., ("CERCLA") the Superfund Amendments and Reauthorization Act, 42 U.S.C. §§ 9601 et. seq., the Federal Toxic Substances Control Act, 15 U.S.C. §§ 2601 et. seq., the Federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et. seq., the Federal Hazardous Material Transportation Act, 49 U.S.C. §§ 1801 et. seq., the Federal Clean Air Act, 42 U.S.C. § 7401 et. seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et. seq, each amendment to such laws, the regulations promulgated pursuant thereto, and each and every comparable statute or ordinance adopted by the jurisdiction(s) wherein the Project is located, including all rules and regulations promulgated under such laws, acts or ordinances.  The provisions of this Section 10.2 shall survive the Closing whether or not incorporated into the Deed to be delivered at Closing.

## 11.  CASUALTY AND CONDEMNATION.

11.1    Risk of Loss.  Seller shall bear all risk of loss or damage to the Project from all causes until the Closing; and is responsible for the costs of any significant repairs consistent with the terms of this Agreement; provided, however, Seller shall have no obligation to repair such loss or damage.

11.2    Purchaser's Option to Terminate.  If prior to the Closing (i) any portion of the Project (other than an immaterial portion) is destroyed by fire, the elements or by any other casualty which is not repaired prior to Closing, or (ii) any portion of the Project is taken by eminent domain, or made the subject of condemnation proceedings (or proposed or threatened condemnation proceedings), Seller shall give Purchaser prompt written notice thereof and Purchaser may elect, by written notice to Seller within the earlier of (i) ten (10) days after Purchaser shall have received written notice of such event from Seller, or (ii) the Closing Date, to terminate this Contract without further liability.  If prior to the Closing an immaterial portion of the Project is destroyed by fire, the elements or by any other casualty which is not repaired prior to Closing, (x) if such casualty occurs prior to the expiration of the Contingency Period, Purchaser may either terminate this Contract in accordance with Section 2.7 or receive a credit of the proceeds at Closing in accordance with Section 11.3.1 below, or (y) if such casualty occurs after the expiration of the Contingency Period and prior to the Closing Date, Seller may elect to either (1) terminate this Contract, in which event the Earnest Money shall be returned to Purchaser and Seller and Purchaser shall have no further obligations hereunder, or (2) credit any proceeds on account of the Purchase Price, including the sum of any deductible under any applicable insurance policy, in accordance with Section 11.3.1 below.  For the purposes of this Section 11, an **"immaterial portion"** of the Project shall mean any portion thereof valued at less than $100,000.00.  If Purchaser elects to terminate this Contract, as aforesaid, then the Title Company will return the Earnest Money to Purchaser free and clear of all rights and claims of Seller with respect thereto, and thereafter neither Seller nor Purchaser shall have any further rights or obligations hereunder (except as otherwise provided herein).

11.3    Failure to Terminate.  If any portion of the Project is destroyed by casualty, taken by eminent domain or made the subject of condemnation proceedings (or proposed or threatened condemnation proceedings), and Purchaser does not elect to terminate this Contract pursuant to Section 11.2 hereof, then at the Closing the following shall occur

Page 14

11.3.1 <u>Credit of Award or Proceeds.</u> Seller shall credit on account of the Purchase Price the amount, as applicable, of all condemnation awards actually received by Seller or any sums of money collected by Seller (whether retained by Seller or paid directly to a holder of any lien on the Project) under its policies of insurance or renewals thereof insuring against the loss in question.

11.3.2 <u>Assignment of Future Awards.</u> In the case of a condemnation, Seller shall also assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to (a) such claims and further sums payable thereunder, and (b) any awards that may be made with respect to any pending or future condemnation proceeding.

11.4 <u>Control of Condemnation Proceedings Before End of Contingency Period.</u> In the event of condemnation proceedings, Seller shall have total control and authority over such proceedings and the prosecution of any claim therein unless the Contingency Period has expired (or Purchaser affirmatively waives the Contingency Period in writing), and unless and until Purchaser has waived its right to terminate under this Section 11. Seller shall keep Purchaser currently apprised of all actions taken or agreed to by Seller in such proceeding prior to Purchaser's election to waive the Contingency Period (if not already expired) and/or its termination option hereunder, such that any decision by Purchaser shall be made based on the then-current status of the proceeding, and the Closing Date may be extended at Purchaser's option. If the Contingency Period has expired, Seller agrees that it will not agree to an award or convey the Project to the condemning authority in lieu of condemnation during Purchaser's termination election period set forth in Section 11.2.

11.5 <u>Control of Condemnation Proceedings After Purchaser is "At-Risk."</u> After the Contingency Period has expired or been waived and after Purchaser makes an election under this Section 11 not to terminate (if Purchaser so elects), Purchaser shall be entitled to participate in any condemnation proceeding on an equal basis with Seller and veto any proposed award or settlement not acceptable to Purchaser.

## 12. DEFAULT AND REMEDIES.

12.1 <u>Purchaser's Default.</u> If Purchaser is in default (which default includes Purchaser failing to close as required by and in accordance with the terms of this Contract) of this Contract prior to or at the Closing and Seller elects to terminate this Contract due to Purchaser's default, the Earnest Money shall be forfeited by Purchaser and retained on behalf of Seller, and both parties shall thereafter be released from all further obligations under this Contract, except as expressly provided to the contrary herein.

Purchaser and Seller acknowledge that Seller's damages would be difficult or impossible to determine in the event of Purchaser's failure to perform its obligations under this Contract and that the Earnest Money and such other things of value are a reasonable estimate of such damages. The Earnest Money and such other payments and things of value shall, therefore, be liquidated damages to Seller and retention thereof shall be Seller's sole and exclusive remedy for Purchaser's failure to perform its obligations under this Contract. In the alternative to retaining the Earnest Money as liquidated damages, Seller may elect to maintain this Contract in full force and effect and bring suit for specific performance. If Seller does not bring suit within thirty (30) days of the scheduled Closing Date, Seller shall be deemed to have elected to retain the Earnest Money as liquidated damages and terminate this Contract. Seller waives all other remedies, including suit for damages other than retention of the Earnest Money.

12.2 <u>Seller's Default.</u> If Seller is in default of any covenant contained in this Contract and continues to be in default after notice thereof from Purchaser and ten (10) days' opportunity to cure the same, Purchaser may elect by written notice to Seller:

(i)     To terminate this Contract, in which case Seller shall, within two (2) business days after receipt of such notice, notify the Title Company in writing to return the Earnest Money and all interest

earned thereon to Purchaser, and thereafter neither party shall have any further obligation under this Contract, except as expressly provided to the contrary herein, or,

(ii)    To maintain this Contract in full force and effect and bring suit for specific performance. Purchaser expressly waives all other remedies, including suit for damages, provided that nothing herein precludes a claim against Seller after Closing for a breach of any representations and warranties, subject to the limitations of Section 8.4 hereof. If Purchaser does not bring suit within thirty (30) days of the scheduled Closing Date, Purchaser shall be deemed to have elected option (i) above.

### 13. BROKERAGE COMMISSIONS.

Purchaser hereby represents and warrants to Seller that Purchaser has not incurred, and shall not have incurred as of the Closing Date, any liability for the payment of any brokerage fee or commission in connection with the transaction contemplated in this Contract. Seller hereby represents and warrants to Purchaser that Seller has not incurred, and shall not have incurred as of the Closing Date, any liability for the payment of any brokerage fee or commission in connection with the transaction contemplated in this Contract, except for P-rime Company, whose commission shall be paid by Seller in an amount equal to two percent (2%) of the Purchase Price. Such commission shall be earned and payable if and only if the Closing is consummated. Seller and Purchaser hereby agree to defend, indemnify and hold harmless the other from and against any and all claims of any other person claiming a brokerage fee or commission through the indemnifying party. This indemnification agreement shall survive Closing.

### 14. MISCELLANEOUS.

14.1    <u>Entire Agreement</u>. This Contract supersedes all prior and contemporaneous discussions, agreements and understandings between Seller and Purchaser and constitutes the entire agreement between Seller and Purchaser with respect to the transaction herein contemplated. This Contract may be amended or modified only by a written instrument executed by Seller and Purchaser.

14.2    <u>Waiver</u>. Each party hereto may waive any breach by the other party of any of the provisions contained in this Contract or any default by such other party in the observance or performance of any covenant or condition required to be observed or performed by it contained herein; PROVIDED, ALWAYS, that such waiver or waivers shall be in writing, shall not be construed as a continuing waiver, and shall not extend to or be taken in any manner whatsoever to affect any subsequent breach, act or omission or default or affect each party's rights resulting therefrom. No waiver will be implied from any delay or failure by either party to take action on account of any default by the other party. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

14.3    <u>Notices</u>. All notices and demands given or required to be given by any party hereto to any other party ("Notices ") shall be in writing and shall be delivered in person or sent by facsimile with electronic confirmation of receipt thereof, or by a reputable overnight carrier that provides a receipt, such as Federal Express or UPS, or by registered or certified U.S. mail, postage prepaid, addressed as follows (or sent to such other address as any party shall specify to the other party pursuant to the provisions of this Section):

Seller:              Verdad Real Estate, Inc.
                     1211 S. White Chapel Blvd.
                     Southlake, Texas 76092
                     Attention: Jason Keen
                     Tel: 817.912.0222

|  | Fax:  817.912.0550<br>Email:  jkeen@verdadrealestate.com |
| with a copy to: | Baker Monroe PLLC<br>505 Pecan Street, Suite 101<br>Fort Worth, Texas 76102<br>Attn: Justin Huston<br>Tel: 817.632.6301<br>Fax: 817.900.8585<br>E-Mail: jhuston@bamolaw.com |
| To Purchaser: | Ching Family Trust B<br>Donna Y. T Ching, Trustee<br>1560 N. Michilinda Ave<br>Pasadena, CA  91107<br>Attn: Mike Ching<br>Phone: (626) 319-8630<br>Facsimile:<br>E-Mail: mching21@yahoo.com |
| with a copy to: | Paul Matusik, P-Prime Company<br>16033 Bolsa Chica St. Suite 104-132<br>Huntington Beach, CA  92649<br>Phone: 855-933-4100<br>Facsimile:888-711-9660<br>E-Mail: pmatusik@p-rime.com |
| To the Title Company: | Fidelity National Title Agency, Inc.<br>850 E. State Highway 114, Suite 200<br>Southlake, Texas 76092<br>Attn:  Stephanie Kleam<br>Phone: 817.442.1111<br>Fax: 817.442.9997<br>E-Mail: skleam@fidelity-usa.com |

All Notices delivered in the manner provided herein shall be deemed given upon actual receipt (or attempted delivery if delivery is refused).  Facsimile transmissions shall be deemed given upon electronic confirmation of such transmission.

14.4   Successors and Assigns.  This Contract shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Contract may not be assigned by Purchaser without the prior written consent of Seller.  Notwithstanding the foregoing, Purchaser shall not be released of any of its obligations under this Agreement.  This provision shall survive Closing.

14.5   Choice of Law, Venue and Forum.  This Contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Texas, without giving effect to its choice of laws principles.  Exclusive venue for any litigation between the parties hereto shall be in Tarrant County, Texas, and shall be brought in the State District Courts of Tarrant County, Texas, or in the United States District Court for the Northern District of Texas, Fort Worth Division.  The parties hereto waive any challenge to personal jurisdiction or venue (including

Page 17

without limitation a challenge based on inconvenience) in Tarrant County, Texas, and specifically consent to the jurisdiction of the State District Courts of Tarrant County and the United States District Court for the Northern District of Texas, Fort Worth Division.

14.6 No Third Parties Benefitted. The parties hereto do not intend to confer any benefit on any person, firm, or corporation other than the parties to this Contract, and their respective successors and assigns.

14.7 Legal Fees. In the event either party hereto fails to perform any of its obligations under this Contract or in the event a dispute arises concerning the meaning or interpretation of any provision of this Contract, the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other party in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable legal fees.

14.8 Construction. The section titles or captions in this Contract are for convenience only and shall not be deemed to be part of this Contract. All pronouns and any variations of pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the identity of the parties may require. Whenever the terms referred to herein are singular, the same shall be deemed to mean the plural, as the context indicates, and vice versa. This Contract shall not be construed as if it had been prepared only by Purchaser or Seller but rather as if both Purchaser and Seller had prepared the same. If any term, covenant, condition, or provision of this Contract or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Contract, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Contract shall be valid and shall be enforced to the fullest extent permitted by law.

14.9 Time of Essence. Time is of the essence of this Contract and each and every term and provision hereof.

14.10 Business Day. As used in this Contract, the term "business day" means Monday through Friday of each week, exclusive of New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving and Christmas Day, or any other holiday recognized by banks in Dallas, Texas. If the final date of any period which is set out in any paragraph of this Contract falls upon a day which is not a business day, then, and in such event, the time of such period will be extended to the next business day.

14.11 Confidentiality. Purchaser covenants and agrees that: (i) all information provided to it by Seller in connection with the Project or resulting from Purchaser's inspections of the Project and review of relevant materials which is not already public information will be held in confidence by it, its agents and employees, and (ii) Purchaser will return all such written information to Seller in the event the transaction contemplated by this Contract is not consummated. Notwithstanding the foregoing, Purchaser may (A) share its information on a need-to-know basis with its consultants, accountants, attorneys and potential equity and financing sources so long as such information is delivered to such parties on the condition of confidentiality consistent with the requirements of this paragraph and (B) make disclosure as required by applicable law or court order. Purchaser further agrees that it will not issue any press releases regarding the Project or the transaction contemplated herein without the prior consultation and express written approval of Seller. Notwithstanding anything herein to the contrary, the provisions of this Section 14.11 shall survive the Closing.

14.12 Counterparts. This Contract may be executed in one or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

14.13   Exhibits.   All of the Exhibits and Schedules referenced in this Contract are attached hereto and incorporated as part of this Contract and shall have the same meaning as if they were incorporated fully within the text of this Contract.

*[SIGNATURE PAGE FOLLOWS.]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Contract as of the Contract Date.

**SELLER:**

VRE CHICAGO ELEVEN, LLC.
a Texas limited liability company

By:_____
Name:___Jason Keen_____
Title:___Manager_____


**PURCHASER:**

Ching Family Trust B

_Donna Y. T. Ching  Trustee_
Donna Y. T. Ching, Trustee

**EXHIBITS ATTACHED:**

| | |
|---|---|
| Exhibit 1.1 | Land |
| Exhibit 2.3 | Due Diligence Materials |
| Exhibit 6.1 | Form of Special Warranty Deed |
| Exhibit 6.2 | Form of Bill of Sale |
| Exhibit 6.3 | Form of Assignment and Assumption of Lease |
| Exhibit 6.4 | Tenant Notice |
| Exhibit 6.6 | Form of Non-Foreign Status Affidavit |
| Exhibit 8.1.8 | Form of Estoppel Certificate |

## EXHIBIT "1.1"
## LEGAL DESCRIPTION OF LAND

LOTS 10, 11, 12 AND 13 IN BLOCK 5 IN SECOND ROSELAND HEIGHTS SUBDIVISION OF THE EAST 2/3 OF THE NORTHWEST 1/4 OF SECTION 10, TOWNSHIP 37 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Exhibit 2.3 – Due Diligence Materials

EXHIBIT "2.3"

DUE DILIGENCE MATERIALS

1.   All existing environmental reports, studies or surveys of the Project in Seller's possession.

2.   Current zoning information relative to the Project.

3.   A copy of the preliminary or final plat of the Project, if applicable.

4.   A copy of the preliminary or, if available, final site plan for the Land and the Improvements.

5.   A copy of the fully executed Tenant Lease.

Exhibit 2.3 – Due Diligence Materials

## EXHIBIT "6.1"
## FORM OF SPECIAL WARRANTY DEED

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

### SPECIAL WARRANTY DEED

STATE OF _____     §
                         §     KNOW ALL MEN BY THESE PRESENTS
COUNTY OF _____     §

FOR VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company ("**Grantor**"), hereby grants, bargains, sells and conveys to _____ ("**Grantee**"), that certain real property located in the County of _____, State of _____, more particularly described on Exhibit "A" attached hereto and incorporated herein by this reference (the "**Land**"), together with all of Grantor's right, title and interest in and to the fixtures and improvements located on the Land (the "**Improvements**"), and together with all rights, privileges and easements appurtenant to the Land, all water, wastewater and other utility rights relating to the Land and any and all easements, rights-of-way and other appurtenances used in connection with the beneficial use and enjoyment of the Land, in each case to the extent assignable (the "**Appurtenances**") (the Land, Improvements and Appurtenances collectively referred to as the "**Property**").

This conveyance is being made by Grantor and accepted by Grantee subject only to those certain title exceptions (the "**Permitted Exceptions**") set forth in Exhibit "B" attached hereto and made a part hereof for all purposes, but only to the extent that such exceptions are valid, existing, and, in fact, affect the Property.

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

Grantee by its acceptance of this Deed acknowledges that, except for the special warranty of title contained in this Deed, neither Grantor nor its representatives have made any representations or warranties as to the Property or its environmental or physical condition, upon which Grantee has relied. Grantee further acknowledges and agrees that it is purchasing the Property as set forth in the Purchase and Sale Agreement dated effective _____, 20___, between Grantor and Grantee (the "**Contract**") in its "as is" condition as set forth in Section 10.1 of the Contract, and that without Grantee agreeing to such conditions and terms this conveyance would not be made. Further, by acceptance of this Deed, Grantee agrees to and reaffirms its promises, obligations and acknowledgements, in the Contract, including that:

(1)   GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER BY GRANTOR OR ANY AGENT OR EMPLOYEE THEREOF REGARDING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ITS PHYSICAL CONDITION, ITS SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS COMPLIANCE WITH LAWS, INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS, OR THE PRESENCE

Exhibit 6.1 — Form of Special Warranty Deed

OR ABSENCE OF CHEMICALS, TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES THEREUPON.

(2)     GRANTEE SHALL ACCEPT THE PROPERTY IN ITS "AS IS", "WHERE IS", "WITH ALL FAULTS" CONDITION, AND GRANTEE ACKNOWLEDGES THAT GRANTOR HAS DISCLAIMED ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXPRESS OR IMPLIED. NOTWITHSTANDING THE ABOVE, EXCEPT TO ANY INFORMATION DISCLOSED TO GRANTEE IN THE DUE DILIGENCE MATERIALS DELIVERED TO GRANTEE UNDER THE CONTRACT, TO THE BEST OF GRANTOR'S ACTUAL KNOWLEDGE, GRANTOR IS UNAWARE OF ANY EXISTING MATERIAL ENVIRONMENTAL OR OTHER LEGAL VIOLATIONS WHICH WOULD BAR THE OPERATION OF A RETAIL RESTAURANT.

(3)     GRANTEE ACKNOWLEDGES THAT IT IS A SOPHISTICATED REAL ESTATE INVESTOR WHO HAD OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AGREEMENTS, STUDIES AND TESTS RELATING TO THE PROPERTY THAT GRANTEE ELECTED TO CONDUCT, AND DID CONDUCT A COMPLETE AND THOROUGH INSPECTION, ANALYSIS AND EVALUATION OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL ISSUES, IF ANY, AND FURTHER RECEIVED AND REVIEWED SUCH INFORMATION AS GRANTEE IN ITS DISCRETION CHOSE TO REVIEW IN THE COURSE OF ITS INVESTIGATION OF THE PROPERTY.

Grantee by its acceptance of this Deed has further waived and released Grantor and the Released Parties from certain claims which are Specifically set forth in Section 10.2 of the Contract, and by this Deed Grantee agrees to and reaffirms its promises, obligations and acknowledgements, in the Contract, including that: GRANTOR IS HEREBY RELEASED BY GRANTEE AND ITS SUCCESSORS AND ASSIGNS OF AND FROM ANY AND ALL RESPONSIBILITY, LIABILITY, OBLIGATIONS AND CLAIMS, KNOWN OR UNKNOWN, INCLUDING, WITHOUT LIMITATION (1) ANY OBLIGATION TO TAKE THE PROPERTY BACK OR REDUCE THE PRICE, OR (2) ACTIONS FOR CONTRIBUTION OR INDEMNITY, THAT GRANTEE OR ITS SUCCESSORS AND ASSIGNS MAY HAVE AGAINST GRANTOR OR THAT MAY ARISE IN THE FUTURE BASED IN WHOLE OR IN PART UPON THE PRESENCE OF CHEMICALS, TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES ON, WITHIN OR UNDER THE SURFACE OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ALL RESPONSIBILITY, LIABILITY, OBLIGATIONS AND CLAIMS THAT MAY ARISE UNDER STATE AND FEDERAL ENVIRONMENTAL LAWS, INCLUDING THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (42 U.S.C. § 9601 ET SEQ), AS AMENDED.

GRANTEE FURTHER ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY EXPLAINED TO GRANTEE AND THAT GRANTEE FULLY UNDERSTANDS AND ACCEPTS THE SAME.

Ad valorem taxes for the year of this deed have been prorated; accordingly, by its acceptance of this Deed, Grantee assumes responsibility to pay all ad valorem taxes on the Property for such year and all subsequent years.

Grantee's mailing address:     _____

_____

_____

Executed as of this _____ day of _____, 20__.

**GRANTOR:**

Exhibit 6.1 – Form of Special Warranty Deed

VRE CHICAGO ELEVEN, LLC,,
a Texas limited liability company

By:_____
Name:_____
Title:_____

THE STATE OF TEXAS          §
                            §
COUNTY OF TARRANT           §

     This instrument was acknowledged before me on _____ _____, 20___, by _____,
_____ of **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company, on behalf of said company.

_____
Notary Public, State of Texas

My Commission Expires:

_____        _____
                                 Printed/Typed Name of Notary

After Recording Return To:
_____
_____
_____
_____

Exhibit 6.1 — Form of Special Warranty Deed

**EXHIBIT "6.2"**
**FORM OF BILL OF SALE**

| | | |
|---|---|---|
| STATE OF _____ | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS |
| COUNTY OF _____ | § | |

That **VRE CHICAGO ELEVEN, LLC,**, a Texas limited liability company ("**Grantor**"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid by _____ ("**Grantee**") the receipt and sufficiency of which are hereby acknowledged and confessed, has SOLD, ASSIGNED, TRANSFERRED and DELIVERED and does by these presents SELL, ASSIGN, TRANSFER and DELIVER unto Grantee, all of Grantor's right, title and interest in and to the following described properties located on, and/or affixed to, and used in connection with, the buildings (the "**Improvements**") situated on those certain lands (the "**Real Property**") in the City of _____, _____ County, _____, more particularly described on Exhibit "**A**" attached hereto and made a part hereof for all purposes, which Real Property has been conveyed by Grantor to Grantee by Special Warranty Deed of even date herewith:

(a)     All equipment and personal property owned by Grantor which is located on or in the Real Property or the Improvements (collectively, the "**Personalty**"). The Personalty specifically excludes any equipment or personal property of _____.

(b)     All right, title and interest to any unpaid insurance claims or proceeds or awards for damages to the Real Property and/or the Improvements resulting from any casualty or any taking in eminent domain or by reason of change of grade of any street.

(c)     Except the name of the Grantor or affiliated entities, all of the interest of Grantor in any intangible property now or hereafter owned by Grantor and used or designed for use in connection with the Real Property, the Improvements and/or the Personalty, and any contract or lease rights, licenses, permits, certificates of occupancy, franchises, agreements, utility contracts, unexpired claims, warranties, guaranties and sureties belonging to Grantor, or other rights relating to the ownership, development, construction, design, use and operation of the Real Property and/or the Improvements, in each case to the extent assignable.

The property described in subsections (b) and (c) above is hereinafter sometimes referred to as the "**Intangible Property**"). Notwithstanding the foregoing, the property assigned and transferred hereunder shall not include any cash, bank accounts, prepaid obligations, and claims and causes of action.

TO HAVE AND TO HOLD the Grantor's rights, titles, and interests in and to the Personalty and the Intangible Property, unto the said Grantee, its successors and assigns, forever.

The Personalty and the Intangible Property and all other property being transferred or assigned hereunder are being transferred and assigned by Grantor to Grantee AS IS, WHERE IS, AND WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE. GRANTEE IS HEREBY THUS ACQUIRING SUCH PROPERTY BASED SOLELY UPON GRANTEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF SUCH PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY GRANTOR OR GRANTOR'S AGENTS OR CONTRACTORS.

Exhibit 6.2 — Form of Bill of Sale

Grantee hereby accepts such assignment and transfer and hereby assumes, and agrees to indemnify and hold harmless Grantor from and against, all obligations of Grantor under the Intangible Property which accrue after the date hereof.

This assignment and transfer is made subject to those matters of record affecting the Property to the extent valid and enforceable.

Grantor and Grantee represent that they each have the full right, power, and authority to execute this Bill of Sale and to perform their respective obligations hereunder.

EXECUTED to be effective the _____ day of _____, 20___.

### GRANTOR:

VRE CHICAGO ELEVEN, LLC,,
a Texas limited liability company

By:_____
Name:_____
Title:_____

### GRANTEE:

CHING FAMILY TRUST B _____
_____

By: _Donna Y. T. Ching_____
Name:_ Donna Y. T. Ching_____

Title:_ Trustee_____

Exhibit 6.2 — Form of Bill of Sale

## EXHIBIT "6.3"
## FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("Assignment") is made effective this ___ day of _____, 20___, by and between VRE CHICAGO ELEVEN, LLC,, a Texas limited liability company ("Assignor"), and _____ ("Assignee").

RECITALS

A.     Assignor, as Landlord, and _____, as Tenant, have entered into that certain Lease Agreement dated _____ (the "Lease") relating to the real property described on the attached Exhibit "A" (the "Property"), which Property has been conveyed to Assignee by Assignor by Special Warranty Deed of even date herewith.

B.     Assignor has agreed to assign the Lease to Assignee in connection with Assignor's sale of the Property to Assignee.

THEREFORE, in consideration of TEN DOLLARS and other valuable consideration, the receipt and sufficiency of which Assignor acknowledges, Assignor does hereby SELL, ASSIGN, TRANSFER, AND DELIVER to Assignee the Lease, all of Assignor's right, title, and interest in and to the Lease, and all of the rights, benefits and privileges of the landlord thereunder, including without limitation the rents and other charges to be payable under the Lease, all prepaid rents and security deposits, and all claims and actions, if any, against the tenants under the Lease, choate or inchoate, and all rents, issues, and profits of the Property (collectively, the "Assigned Rights"); TO HAVE AND TO HOLD all and singular the Lease unto Assignee, its successors and assigns, and Assignor does hereby bind itself and its successors to WARRANT AND FOREVER DEFEND all and singular the Lease and other Assigned Rights unto Assignee, its successors and assigns, against every person whomsoever lawfully claiming or attempting to claim same, or any part thereof, by through or under Assignor, but not otherwise, subject, however, to permitted exceptions set forth in the Deed of even date herewith from Assignor as Grantor to Assignee as Grantee.

Assignor states that no other assignment by Assignor exists in connection with the Lease or Assigned Rights.

Assignor represents, warrants, covenants, and agrees that Assignor has performed and discharged any and all obligations of Assignor under the Lease arising prior to the effective date of this Assignment. ASSIGNOR AGREES TO INDEMNIFY AND HOLD HARMLESS ASSIGNEE FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, OR CAUSES OF ACTION EXISTING IN FAVOR OF OR ASSERTED BY LESSEES UNDER THE LEASE AND ARISING OUT OF OR RELATING TO ASSIGNOR'S FAILURE TO PERFORM ANY OF THE OBLIGATIONS UNDER THE SAID LEASE, ARISING OR ACCRUING PRIOR TO THE DATE OF THIS ASSIGNMENT, BUT NOT OTHERWISE.

Assignee assumes all liability, obligations, and duties to perform all of the terms and conditions of the Lease on the part of the Assignor to be performed on and after the date of this Assignment, and Assignee covenants and agrees to discharge any and all obligations of Assignor under the Lease arising after the effective date of this Assignment. ASSIGNEE AGREES TO INDEMNIFY AND HOLD HARMLESS ASSIGNOR FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, OR CAUSES OF ACTION EXISTING IN FAVOR OF OR ASSERTED BY THE LESSEE UNDER THE LEASE AND ARISING OUT OF OR RELATING TO ASSIGNEE'S FAILURE TO PERFORM ANY OF THE OBLIGATIONS UNDER THE SAID LEASE, ARISING AFTER THE DATE OF THIS ASSIGNMENT, BUT NOT OTHERWISE.

All of the covenants, terms and conditions set forth herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, assigns, and legal representatives.

Exhibit 6.3 -- Form of Assignment and Assumption of Lease

Assignee covenants and agrees to deliver a signed statement to the tenant under the Lease acknowledging that Assignee has received and is responsible for said tenant's security deposit as set forth on Exhibit "B".

ASSIGNOR:

VRE CHICAGO ELEVEN, LLC,
a Texas limited liability company

By: _____
Name: _____
Title: _____

ASSIGNEE:

CHING FAMILY TRUST B _____
_____

By: *Donna Y. T. Ching* _____
Name: Donna Y. T Ching _____

Title: Trustee _____

Exhibit 6.3 — Form of Assignment and Assumption of Lease

**EXHIBIT "6.6"**
**FORM OF NON-FOREIGN STATUS AFFIDAVIT**

THE STATE OF TEXAS     §
                         §         KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TARRANT    §

THIS NON-FOREIGN STATUS AFFIDAVIT is provided pursuant to the requirements of I.R.C. Section 1445(b)(2) in connection with the sale by VRE CHICAGO ELEVEN, LLC, a Texas limited liability company (the "Transferor"), to _____ (the "Transferee"), of the property (the "Property") described on Exhibit "A" attached hereto.

Under Section 1445 of the Internal Revenue Code, a transferee of U.S. real property interest must withhold tax with respect to certain transfers of property if the transferor is a foreign person. To inform Transferee that no withholding is required upon transfer of the Property by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

1.     Transferor is not a foreign person (as such term is defined in the Internal Revenue Code and Income Tax Regulations).

2.     Transferor's U.S. taxpayer identification number is _____.

3.     Transferor's business address is 1211 S. White Chapel Blvd., Southlake, Texas 76092.

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punishable by fine, imprisonment, or both.

Under penalties of perjury, I declare that we have examined this certification, and to the best of my knowledge and belief, do swear it is true, correct and complete.

EXECUTED AND DELIVERED the _____ day of _____, 20___.

"Transferor":

VRE CHICAGO ELEVEN, LLC,,
a Texas limited liability company

By:_____
     Jason Keen,_____

THE STATE OF TEXAS     §
                         §
COUNTY OF TARRANT    §

This instrument was acknowledged before me on _____, 20___, by _____, _____ of VRE CHICAGO ELEVEN, LLC,, a Texas limited liability, on behalf of said company.

_____
Notary Public, State of Texas

Exhibit 6.6 — Form of Non-Foreign Status Affidavit

<u>EXHIBIT "8.1.8"</u>

<u>FORM OF ESTOPPEL CERTIFICATE</u>

ESTOPPEL CERTIFICATE

_____, 20___

To:     _____
        _____
        _____

Re:     That certain Lease Agreement dated as of _____ by and between VRE Chicago
        Eleven, LLC,, a Texas limited liability company ("<u>Landlord</u>"), and _____, a
        _____ ("<u>Tenant</u>"), covering certain property located at
        _____, consisting of approximately _____ square feet of retail
        space more particularly described therein (the "<u>Lease</u>")

Dear _____:

        Tenant understands that Landlord (hereinafter called "<u>Seller</u>"), owner of the tract of land which
is the subject of the Lease, which tract is located at the above-referenced location in the City of
_____, _____ County, _____ (the "<u>Property</u>"), intends to sell the Property to
you or your assigns ("<u>Purchaser</u>").  Tenant hereby certifies the following to Purchaser:

        1.      Attached hereto as Exhibit "A" are true, complete and accurate copies of the Lease,
including all amendments and modifications.

        2.      The Lease is in full force and effect; there are no amendments or modifications of any
kind to the Lease except as referenced herein; there are no other promises, agreements,
understandings, or commitments between Landlord and Tenant relating to the Property, the Lease; and
Tenant has not given Landlord any notice of termination under the Lease.  There are no remaining
conditions to Tenant's obligations under the Lease.

        3.      Tenant is in full and complete possession of the Property pursuant to the Lease, and
there has not been an assignment by Tenant of the Lease, or any rights therein, nor any subletting, to
any party.

        4.      There is no security deposit under the Lease.

        5.      To the best of the undersigned's knowledge and belief, no uncured default, event of
default, or breach by Landlord exists under the Lease, and no facts or circumstances exist that, with
the passage of time or the giving of notice, or both, will or could constitute a default, event of default,
or breach under the Lease.  Tenant has made no claim against Landlord alleging Landlord's default
under the Lease.

Exhibit 8.1.8 -- Form of Estoppel Certificate

6.    To the best of the undersigned's knowledge and belief, there are no rental, lease, or similar commissions payable with respect to the Lease, except as may be expressly set forth therein.

7.    Tenant is obligated to pay rent to Landlord at the rate set forth in the Lease. The Tenant is current with respect to, and is paying the full rent and other charges stipulated in the Lease with no offsets, deductions, defenses or claims, and Tenant has not prepaid any rent or other amounts to Landlord other than rent and other charges due and payable in the calendar month of this certification. None of the rent which Tenant is required to pay under the Lease has been prepaid more than one (1) month in advance, and Tenant agrees not to pay rent more than one (1) month in advance unless otherwise Specified in the Lease.

8.    Neither a purchaser at foreclosure nor owner by virtue of a deed in lieu of foreclosure of the Property shall be responsible for any security deposit or rent payment paid more than thirty (30) days in advance of its due date that is not actually received by such person or entity.

9.    Tenant is not entitled to any concession or rebate or other charges from time to time due under the Lease.

10.    The current monthly base rent under the Lease paid by Tenant is $_____, which has been paid in full for the period ending _____, 20___.

11.    Tenant acknowledges that the initial "Lease Term" (as such term is defined in the Lease) of the Lease commenced on _____, 20___, and shall expire on _____, 20___, unless sooner terminated in accordance with the terms of the Lease. Tenant has the option to extend the Lease Term for _____ (___) additional periods of _____ (___) years each as expressly set forth in the Lease.

12.    The undersigned representative of Tenant is duly authorized and fully qualified to execute this instrument on behalf of Tenant, thereby binding Tenant.

13.    All notices to be sent to Tenant shall be sent to the address as set forth in the Lease.

14.    Tenant has no existing option or contractual right to purchase the Property or any part thereof.

15.    Tenant is responsible for all taxes, insurance and maintenance obligations pertaining to the Property, and the Lease is intended to be a triple net lease. Any implications that Landlord is required to carry insurance in Section ___ of the Lease are incorrect, since Landlord has no obligation to carry insurance on the Property or the improvements thereon.

16.    Landlord has completed all of its build out obligations under the Lease. Landlord has paid or repaid to the Tenant all moneys due to Tenant under the Lease, including all monies owed to Tenant as an improvement allowance.

17.    Landlord acknowledges and agrees that Purchaser shall be entitled to rely on Tenant's certifications set forth herein.

Exhibit 8.1.8 – Form of Estoppel Certificate

IN WITNESS WHEREOF, Tenant has executed this instrument this _____ day of _____, 20___.

_____

a _____

By: _____
Name: _____
Title: _____

Exhibit 8.1.8 -- Form of Estoppel Certificate

EXHIBIT "A"

LEASE

[Attached]

Exhibit 8.1.8 -- Form of Estoppel Certificate

# Frontier Star 1, LLC
## Franchisees of Carl's Jr. & Hardee's Restaurants
## Confidential Information Memorandum!



**EXHIBIT**

2

# Frontier Star 1, LLC

## Franchisees of Carl's Jr. & Hardee's Restaurants

## Confidential Information Memorandum!

This Confidential Information Memorandum ("Memorandum") has been prepared solely for information purposes. In this Confidential Information Memorandum (the "Memorandum"), the term "Transaction" means, whether effected in one Transaction or a series of related Transactions, placement of debt related to the Assets. The sole purpose of this Memorandum is to assist the recipient in deciding whether it wishes to proceed with a proposed Transaction.

The recipient will hold this Memorandum and all information made available hereunder in strict confidence for the benefit of Frontier Star 1, LLC and its subsidiaries ("Company") and will use such information only for the purpose of evaluating the proposed Transac-on and only in a manner which is consistent with the agreed to Confidentiality Agreement. The reproduction of this memorandum in whole or in part without the prior permission of the Company is strictly prohibited. Further, the receipt of this Memorandum shall confirm that recipient will adhere to the terms of the Confidentiality Agreement.



Neither the Company nor any of their affiliates or representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the information contained herein or any other written or oral communication transmitted or made available to any recipient. The Company and their respective affiliates and representatives expressly disclaim any and all liability based, in whole or in part, on such information, errors therein or omissions there from.

In addition, this Memorandum may include certain pro forma calculations, projections and forward looking statements provided by the Company and other sources believed to be reliable with respect to anticipated future performance. Such projections and forward looking statements reflect various assumptions of management concerning future performance, which assumptions may or may not prove to be correct. The actual results may vary from the anticipated results and such variations may be material. No representations or warranties are made as to the accuracy or reasonableness of such assumptions or the projections or forward looking statements based thereon. Only those representations and warranties, which may be made in a definitive written agreement relating to the Transaction, when and if executed, and subject to any limitations and restrictions as may be specified in such definitive agreement, shall have any legal effect.

# BRAND STRENGTH & HISTORY









Founded in 1941 by Carl Karcher. "The place to go" for a big, juicy burger in the Western U.S. Signature menu items include the 100% Angus beef Thickburgers™ on Fresh Baked Buns, Hand Breaded Chicken Tenders, and Made from Scratch™ Biscuits.

Founded in 1961 by Wilber Hardee. Acquired by CKE Restaurants, Inc. in July 1997. "The place to go" for a big juicy burger in the Midwestern and Southeastern U.S. Signature menu items include 100% Angus beef Thickburgers™ on Fresh Baked Buns, Hand Breaded Chicken Tenders, and Made from Scratch™ Biscuits.





# PRINCIPALS







### JASON LEVECKE

With over 25 years of restaurant experience, Jason is a grandson of Carl's Jr. founder, Carl Karcher, who started in Los Angeles, California with a hot dog cart. From a very early age Jason toured restaurants with his grandfather, learning the importance of quality, service, cleanliness, and hard work in building a successful restaurant enterprise. Jason started his working career on the front lines of the restaurant business, working as a cook and cashier at Carl's Jr. Ultimately, after several years as a Carl's Jr. General Manager Jason married the love of his life, Andi, and then enlisted in the United States Marine Corps where he spent five years active duty as an Arabic linguist. He and his family have carried their Grandfather's values into both their business and community efforts. Today Jason, Andi and their five children enjoy an active life, staying involved in their local community and work with their partners on their growing enterprise.

### CARL LEVECKE

Carl brings over 20 years of restaurant experience to the Company. Carl is also a grandson of Carl's Jr. founder, Carl Karcher. As a namesake to his Grandfather, Carl grew up very close to the restaurant business and always aimed to become a restaurateur himself. Carl has led operations as COO of this growing franchise enterprise. Carl has shown remarkable success in keeping managers and employees motivated while maintaining a tight grasp on revenues and expenditures. Carl is also extremely competitve and has a knack for building loyalty and team spirit within the organization. Carl married the love of his life, Neisha, and today, they, their four children enjoy an active life, are involved in their local community and work alongside their partners on their growing enterprise

### MARGARET LEVECKE EDGAR

Margaret brings over 18 years of restaurant experience to the Company. Margaret is also a granddaughter of Carl's Jr. founder, Carl Karcher. Like her brothers Margaret grew up very close to the restaurant business. Margaret is a Graduate of the University of San Diego, has also worked from the ground up, starting at other concepts, and then also starting as a cook and cashier at Carl's Jr.. Today Margaret is Chief Administrative Officer of their growing enterprise. With expertise in several disciplines, a hard work ethic and her shared passion for this industry, its people and these brands, Margaret is a tremendous asset and integral part of the team. Margaret, her husband Gregg, and their growing family also enjoy an active life, are involved in their local community and work along side their partners on their growing enterprise.

# LOCATIONS



**CHICAGO**



**DALLAS**



**PUERTO VALLARTA**



**PHOENIX**

# GROWTH



Frontier Star 1, LLC
Balance Sheet

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash | 400,678 | 2,132,043 | 7,482,743 | 6,020,789 | 4,625,000 |
| Inventory | 390,884 | 596,597 | 779,174 | 1,048,645 | 1,808,575 |
| Fixed Assets | 16,804,059 | 46,636,213 | 58,468,640 | 92,725,490 | 109,342,025 |
| Receivables | 6,114,745 | 1,904,943 | 0 | 1,242,024 | 1,471,360 |
| **TOTAL ASSETS** | 23,710,365 | 51,269,795 | 66,730,557 | 101,036,948 | 117,246,960 |
| **LIABILITIES & EQUITY** | | | | | |
| Current Liabilities | 2,737,559 | 3,764,207 | 5,503,696 | 5,975,392 | 6,541,244 |
| Notes Payable | 1,214,050 | 20,358,309 | 24,328,560 | 44,127,815 | 40,712,568 |
| Equity | 19,758,756 | 27,147,279 | 36,898,301 | 50,933,741 | 69,993,148 |
| **TOTAL LIABILITIES & EQUITY** | 23,710,365 | 51,269,795 | 66,730,557 | 101,036,948 | 117,246,960 |

Frontier Star 1, LLC
Income Statement

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **Sales** | | | | | |
| Net Sales | 54,366,205.51 | 61,201,324.04 | 84,030,460.21 | 117,744,528.14 | 161,929,753.29 |
| Total Sales | 54,366,205.51 | 61,201,324.04 | 84,030,460.21 | 117,744,528.14 | 161,929,753.29 |
| | | | | | |
| **Cost of Sales** | | | | | |
| Food | 14,909,196.78 | 17,866,005.66 | 24,343,879.10 | 34,527,135.36 | 47,623,480.64 |
| Paper | 1,778,799.22 | 2,102,760.69 | 2,980,698.21 | 3,992,471.70 | 5,640,729.09 |
| Payroll Hourly | 12,990,138.98 | 14,423,772.73 | 18,519,044.32 | 25,719,082.55 | 35,587,289.21 |
| Supplies | 377,316.49 | 437,049.95 | 561,430.90 | 813,311.96 | 875,652.03 |
| POS | 187,407.15 | 144,979.14 | 211,487.39 | 214,479.88 | 410,212.94 |
| Repair & Maintenance | 982,530.49 | 1,002,889.03 | 1,392,363.00 | 2,242,657.14 | 3,324,240.49 |
| Total Cost of Sales | 31,225,389.11 | 35,977,457.20 | 48,008,902.92 | 67,509,138.59 | 93,461,604.40 |
| | | | | | |
| **Total Gross Profit** | 23,140,816.40 | 25,223,866.84 | 36,021,557.29 | 50,235,389.55 | 68,468,148.89 |
| | | | | | |
| **Operating Expenses** | | | | | |
| Cash Over/Short | 257,032.44 | 128,286.26 | 31,785.04 | 98,670.88 | 120,392.19 |
| Total Cash Over/Short | 257,032.44 | 128,286.26 | 31,785.04 | 98,670.88 | 120,392.19 |
| | | | | | |
| **Controllable Expenses** | | | | | |
| GM Salaries | 2,535,143.44 | 2,709,759.78 | 3,528,750.35 | 5,069,641.10 | 7,430,409.07 |
| Gift Cards / NonSales | (53,054.26) | 7,733.29 | 8,306.39 | (26,589.49) | (19,709.98) |
| CO2 | 81,391.17 | 72,161.79 | 123,443.48 | 123,886.39 | 183,993.37 |
| Soda Rebates | (970,026.44) | (903,955.88) | (1,759,965.30) | (2,495,150.00) | (3,437,867.28) |
| Total Controllable Expenses | 1,593,453.91 | 1,885,698.98 | 1,900,534.92 | 2,671,788.00 | 4,156,825.18 |
| | | | | | |
| **Allocated Controllable Expenses** | | | | | |
| Payroll Taxes/Service Fees | 1,777,225.52 | 2,546,782.14 | 2,735,639.11 | 3,683,548.16 | 5,109,356.21 |
| Workers Comp Insurance | - | 622.59 | 393,888.28 | 680,657.27 | 951,676.25 |
| Insurance, Prop and Liab | 349,093.25 | 345,354.55 | 353,365.72 | 528,752.44 | 746,833.38 |
| Health Benefits | 343,103.99 | (98,440.77) | 328,517.73 | 587,719.65 | 901,313.89 |

| | | | | | |
|---|---|---|---|---|---|
| Security | 375,120.95 | (30,024.17) | 59,228.41 | 514,412.53 | 1,323,222.86 |
| Music/TV | 25,921.55 | 32,848.90 | 23,419.91 | 20,589.58 | 50,533.89 |
| POP | 98,074.07 | 33,652.66 | 129,050.99 | 243,390.13 | 314,484.26 |
| Fire/Hoods/Grease/Windows/Pest/Landscape | 90,266.49 | 86,805.73 | 198,925.30 | 440,543.36 | 599,412.16 |
| MIH Order Form | 59,388.98 | (3,052.26) | 2,292.26 | - | - |
| Allocated Controllable Expense Allocation | | 609,844.00 | 47,025.38 | (175,958.67) | (267,658.89) |
| Total Allocated Controllable Expenses | 3,118,194.80 | 3,524,393.37 | 4,271,353.09 | 6,523,654.45 | 9,729,174.01 |
| **Utilities** | | | | | |
| Electricity | 1,976,287.71 | 1,955,625.13 | 2,492,374.85 | 3,616,337.17 | 4,736,795.96 |
| Gas | 614,582.37 | 617,174.07 | 785,515.54 | 1,004,350.16 | 1,545,216.21 |
| Water | 355,053.40 | 349,747.36 | 598,229.42 | 757,842.98 | 960,078.91 |
| Telephone/ Broadband Access | 121,840.63 | 167,984.68 | 208,582.91 | 272,461.89 | 567,876.97 |
| Trash/Refuse Service | 139,820.80 | 159,890.68 | 169,559.64 | 336,295.72 | 560,027.40 |
| Total Utilities | 3,207,584.91 | 3,250,421.92 | 4,254,262.36 | 5,987,287.92 | 8,369,995.45 |
| **Fixed Costs** | | | | | |
| Rent | 3,388,178.81 | 4,555,329.76 | 7,105,715.90 | 11,416,572.30 | 13,916,466.19 |
| Common Area Maint (CAM) | - | 21,010.70 | 152,375.86 | 225,296.61 | 241,499.41 |
| Property Taxes | 860,871.13 | 1,038,678.44 | 1,386,468.12 | 1,802,380.52 | 2,825,742.76 |
| Licenses and Permits | 41,705.25 | 39,877.03 | 50,304.93 | 106,009.01 | 328,444.93 |
| Merchant Service Fees | 344,969.09 | 481,591.64 | 890,880.22 | 1,311,551.24 | 1,917,615.90 |
| Dist Taxes | 27,134.40 | 28,879.78 | 39,614.69 | 60,874.38 | 106,726.47 |
| Advertising | 2,372,733.85 | 2,650,858.42 | 3,713,961.04 | 5,756,440.86 | 7,713,390.18 |
| Royalties | 2,142,539.84 | 2,387,012.23 | 3,190,338.92 | 4,307,487.94 | 5,784,433.15 |
| Delivery Charges | - | | 17,443.50 | 5,610.66 | 5,276.97 |
| Lease Income/Other | (116,656.38) | (248,798.21) | (539,965.29) | (707,368.26) | (1,659,848.83) |
| Total Fixed Costs | 9,061,475.99 | 10,954,439.79 | 16,007,137.89 | 24,284,855.26 | 31,179,747.13 |
| Total Operating Expenses | 17,237,742.05 | 19,743,240.32 | 26,465,073.30 | 39,566,256.51 | 53,556,133.96 |
| Total Operating Profit | 5,903,074.35 | 5,480,626.52 | 9,556,483.99 | 10,669,133.04 | 14,912,014.93 |
| Total General & Administrative | 2,162,992.24 | 2,098,882.52 | 3,197,388.61 | 3,532,335.84 | 4,857,892.60 |
| EBITDA | 3,740,082.11 | 3,381,744.00 | 6,359,095.38 | 7,136,797.20 | 10,054,122.33 |

**EXHIBIT**

**3**

REPRESENTATIVE PHOTO

EXP REALTY ADVISORS

INVESTMENT OFFERING | $2,443,000 | 7.0% CAP

KFC

107 EAST 95TH STREET, CHICAGO, IL

**property.** 2,789 SF building on .33± acres.

**tenant.** Franchisee operates 22 KFC restaurants in the Chicago Market. One of the largest multi-unit franchise restaurant operators with over 200 locations.

**lease structure.** Brand new, 20-year, NNN lease with 10% rent increases every 5-years in initial term.

**location.** KFC is located along East 95th street (24,300 Cars / Day), only .2 miles east of Dan Ryan Expressway (186,094 Cars / Day). East 95th street is a major east-west thoroughfare on Chicago's south side and in the southwest suburbs, while Dan Ryan Expressway is an arterial north-south freeway – also designated as "Interstate 94" and "Interstate 90". This accessibility has spurred the development of various retail tenants in the immediate trade area. National credit tenants in the area include McDonald's, Burger King, Subway, Walgreens, Home Depot, Lowes, Target, Walgreens, Marshalls, Burlington Coat Factory, Payless Shoe Source, Dollar Tree, Staples, Verizon, Autozone, O'Reilly, Mobil 1, Citgo, BP, and many others. The subject property is an extremely dense residential area, the population within a 3-mile radius is 246,168 people.

214.915.8890
**BOB MOORHEAD**
bob@exp1031.com
**JOE CAPUTO**
joe@exp1031.com
**RUSSELL SMITH**
russell@exp1031.com

# TABLE OF CONTENTS | DISCLAIMER

KFC

107 EAST 95TH STREET, CHICAGO, IL

PAGE 1:     COVER

PAGE 2:     TABLE OF CONTENTS | DISCLAIMER

PAGE 3:     INVESTMENT | TENANT | LEASE OVERVIEW

PAGE 4-5:   AERIAL PHOTOS

PAGE 6:     LOCATION OVERVIEW

PAGE 7-8:   LOCATION MAPS

PAGE 9:     DEMOGRAPHICS

## DISCLAIMER

EXP Realty Advisors, Inc. ("Agent") has been engaged as an agent for the sale of the property located at 107 East 95th Street, Chicago, IL by the owner of the Property ("Seller"). The Property is being offered for sale in an "as-is, where-is" condition and Seller and Agent make no representations or warranties as to the accuracy of the information contained in this Offering Memorandum. The enclosed materials include highly confidential information and are being furnished solely for the purpose of review by prospective purchasers of the interest described herein. The enclosed materials are being provided solely to facilitate the prospective investor's own due diligence for which it shall be fully and solely responsible. The material contained herein is based on information and sources deemed to be reliable, but no representation or warranty, express or implied, is being made by Agent or Seller or any of their respective representatives, affiliates, officers, employees, shareholders, partners and directors, as to the accuracy or completeness of the information contained herein. Summaries contained herein of any legal or other documents are not intended to be comprehensive statements of the terms of such documents, but rather only outlines of some of the principal provisions contained therein. Neither the Agent nor the Seller shall have any liability whatsoever for the accuracy or completeness of the information contained herein or any other written or oral communication or information transmitted or made available or any action taken or decision made by the recipient with respect to the Property. Interested parties are to make their own investigations, projections and conclusions without reliance upon the material contained herein. Seller reserves the right, at its sole and absolute discretion, to withdraw the Property from being marketed for sale at any time and for any reason. Seller and Agent each expressly reserves the right, at their sole and absolute discretion, to reject any and all expressions of interest or offers regarding the Property and/or to terminate discussions with any entity at any time, with or without notice. This offering is made subject to omissions, correction of errors, change of price or other terms, prior sale or withdrawal from the market without notice. Agent is not authorized to make any representations or agreements on behalf of Seller. Seller shall have no legal commitment or obligation to any interested party reviewing the enclosed materials, performing additional investigation and/or making an offer to purchase the Property unless and until a binding written agreement for the purchase of the Property has been fully executed, delivered, and approved by Seller and any conditions to Seller's obligations hereunder have been satisfied or waived. By taking possession of and reviewing the information contained herein, the recipient agrees that (a) the enclosed materials and their contents are of a highly confidential nature and will be held and treated in the strictest confidence and shall be returned to Agent or Seller promptly upon request; and (b) the recipient shall not contact employees or tenants of the Property directly or indirectly regarding any aspect of the enclosed materials or the Property without the prior written approval of the Seller or Agent; and (c) no portion of the enclosed materials may be copied or otherwise reproduced without the prior written authorization of Seller and Agent.

Listed in association with ILLINOIS broker of record:
TARTAN REALTY GROUP INC | license #: 478.011278



SUBJECT PROPERTY

3

# INVESTMENT OVERVIEW
KFC

107 EAST 95TH STREET, CHICAGO, IL

| | |
|---|---|
| **PRICE \| CAP:** | $2,443,000 \| 7.0% |
| **NET OPERATING INCOME:** | $171,000 |
| **PROJECTED BUILDING AREA:** | 2,789± Square Feet |
| **LAND AREA:** | .33± Acres |
| **YEAR BUILT:** | 2002 |
| **LANDLORD RESPONSIBILITY:** | None |
| **OWNERSHIP:** | Fee Simple Interest |
| **OCCUPANCY:** | 100% |

# LEASE OVERVIEW

| | |
|---|---|
| **Initial Lease Term:** | 20-Years, Plus 4, 5-Year Options to Renew |
| **Projected Rent Commencement:** | May 2014 |
| **Projected Lease Expiration:** | May 2034 |
| **Lease Type:** | Absolute NNN |
| **Rent Increases:** | 10% Increase Every 5 Years In Initial Term |
| **Year 1-5 Annual Rent (Current):** | $171,000 |
| **Year 6-10 Annual Rent:** | $188,100 |
| **Year 11-15 Annual Rent:** | $206,910 |
| **Year 16-20 Annual Rent:** | $227,601 |
| **Year 21-25 Annual Rent (Option 1):** | market rate |
| **Year 26-30 Annual Rent (Option 2):** | negotiated rate for first 5 year option x 1.05 |
| **Year 31-35 Annual Rent (Option 3):** | negotiated rate for first 5 year option x 1.10 |
| **Year 36-40 Annual Rent (Option 4):** | negotiated rate for first 5 year option x 1.15 |

# TENANT OVERVIEW

Frontier Star 1, LLC, a Delaware limited liability company

**FRONTIER STAR 1, LLC**
Franchisee operates 22 KFC restaurants in the Chicago Market and is currently one of the largest multi-unit franchise restaurant operators with over 200 locations.

**KFC | www.kfc.com**
Based in Louisville, KY, KFC Corporation is the franchisor of the world's most popular chicken restaurant chain, specializing in Original Recipe®, Extra Crispy™, Kentucky Grilled Chicken® and Extra Crispy™ Strips with home-style sides, Hot Wings™ and freshly made chicken sandwiches. KFC has been serving customers complete, freshly prepared, family meals since Colonel Harland Sanders founded the concept in 1952.

Famous for its Original Recipe® fried chicken, which is made with the same secret blend of 11 herbs and spices Colonel Sanders perfected more than a half century ago, it is estimated that, on average, more than 185 million people see a KFC commercial at least once a week – that's more than half the U.S. population.

The KFC system serves more than 12 million customers each day in more than 115 countries and territories around the world. KFC operates more than 17,000 restaurants in the Unites States and internationally. KFC's parent company is Yum! Brands, Inc., the world's largest restaurant company in terms of system restaurants, with more than 40,000 locations in more than 130 countries and territories and employing more than one million associates. Yum! is ranked number 201 on the Fortune 500 List, with revenues exceeding $13 billion in 2012.





**AERIAL PHOTO**
KFC

107 EAST 95TH STREET, CHICAGO, IL



AERIAL PHOTO

KFC

107 EAST 95TH STREET, CHICAGO, IL

Abbott Park

Dan Ryan Expressway (I-86-I94 Cars / Day)

# LOCATION OVERVIEW
## KFC

107 EAST 95TH STREET, CHICAGO, IL

## IMMEDIATE TRADE AREA

KFC is located along East 95th street (24,300 Cars / Day), only .2 miles east of Dan Ryan Expressway (186,094 Cars / Day). East 95th street is a major east-west thoroughfare on Chicago's south side and in the southwest suburbs, while Dan Ryan Expressway is an arterial north-south freeway – also designated as "Interstate 94" and "Interstate 90".

This accessibility has spurred the development of various retail tenants in the immediate trade area. National credit tenants in the area include McDonald's, Burger King, Subway, Home Depot, Lowes, Target, Walgreens, Marshalls, Burlington Coat Factory, Payless Shoe Source, Dollar Tree, Staples, Verizon, Autozone, O'Reilly, Mobil 1, Citgo, BP, and many others. The subject property is an extremely dense residential area, the population within a 3-mile radius is 246,168 people.

## CHICAGO, IL

Chicago is located in northeastern Illinois along the shore of Lake Michigan. The city currently has a population of 2,714,856 making it the third largest city in the US.

The economy of Chicago is the fourth largest metropolitan economy in the world measured by gross metropolitan product (GMP). In 2010 the GMP was approximately $532 billion falling only behind New York City and Los Angeles. Due to the city's economic diversification it is voted regularly as the most balanced economy in the United States. It ranks seventh on the world global cities index and is listed as an Alpha+ global city by the Globalization of World Cities Research Network. Recently, Chicago was named the fourth most important business center in the world. The area also recorded the greatest number of new or expanded corporate facilities in the United States in six out of seven years from 2001 to 2008. In 2009, UBS named Chicago as the ninth wealthiest city in the world.

Chicago is a major world financial center, with the second largest central business district in the United States. The city is the headquarters of the Federal Reserve Bank of Chicago the Seventh District of the Federal Reserve). The city is also home to major financial and futures exchanges, including the Chicago Stock Exchange, the Chicago Board Options Exchange (CBOE), and the Chicago Mercantile Exchange (the "Merc"), which is owned, along with the Chicago Board of Trade (CBOT) by Chicago's CME Group

The CME Group, in addition, owns the New York Mercantile Exchange (NYMEX), the Commodities Exchange Inc. (COMEX) and the Dow Jones Indexes. Perhaps due to the influence of the Chicago school of economics, the city also has markets trading unusual contracts such as emissions (on the Chicago Climate Exchange) and equity style indices (on the U.S. Futures Exchange). Chase Bank has its commercial and retail banking headquarters in Chicago's Chase Tower.

The tourism and convention industry contributes significantly to the local economy. The city is the United States' third-largest convention destination. Chicago attracted 32.4 million domestic leisure travelers, 11.7 million domestic business travelers and 1.3 million overseas visitors. These visitors contributed more than US$11.8 billion to Chicago's economy.

Manufacturing, printing, publishing and food processing also play major roles in the city's economy. Moreover, the construction of the Illinois and Michigan Canal, which helped move goods from the Great Lakes south on the Mississippi River, and of the railroads in the 19th century made the city a major transportation center in the United States.

The city and its surrounding area are home to the second largest labor pool in the US with approximately 4.25 million workers. A high number of Fortune 1000, Fortune Global 500, and Financial Times 500 companies operate within Chicago in order to capitalize on this labor pool. These companies include, Boeing, which moved its headquarters from Seattle to Chicago in 2001, McDonald's, Kraft Foods, and Sears Holding Corporation. Additionally, United Continental Holdings (United Airlines), Baxter International, and Abbot Laboratories are headquartered in the Chicago area.

## CHICAGOLAND

The Chicago-Joliet-Naperville, IL-IN-WI MSA, or colloquially known Chicagoland is the statistical area associated with the city of Chicago as outlined by the US Office of Management and Budget (OMB). Chicagoland is the 3rd largest MSA by population in the US with a total population of 9,461,105 as of the 2010 Census. It is the larger portion of an even greater statistical area; the Great Lakes Megalopolis. The Great Lakes Megalopolis includes the group of North American metropolitan areas which surround the Great Lakes region mainly within the midwestern United States and the southern Ontario area of Canada. With a total population of 59,144,461 residents; it is arguably the most important economic region in the world.



**LOCATION MAP**
KFC

107 EAST 95TH STREET, CHICAGO, IL



LOCATION MAP
KFC

107 EAST 95TH STREET, CHICAGO, IL

# DEMOGRAPHICS
## KFC

107 EAST 95TH STREET, CHICAGO, IL




## DEMOGRAPHIC SNAPSHOT

| Radius | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| **Population:** | | | |
| 2018 Projection | 28,418 | 253,863 | 631,346 |
| 2013 Estimate | 27,186 | 246,168 | 613,553 |
| 2010 Census | 24,546 | 231,977 | 582,103 |
| Growth 2013-2018 | 4.53% | 3.13% | 2.90% |
| Growth 2010-2013 | 10.76% | 6.12% | 5.40% |
| **Households:** | | | |
| 2018 Projection | 10,118 | 92,554 | 225,076 |
| 2013 Estimate | 9,743 | 90,486 | 220,158 |
| 2010 Census | 8,988 | 87,448 | 213,078 |
| Growth 2013 - 2018 | 3.85% | 2.29% | 2.23% |
| Growth 2010 - 2013 | 8.46% | 1.09% | -0.50% |
| Owner Occupied | 6,288 | 49,492 | 111,582 |
| Renter Occupied | 3,454 | 40,994 | 108,577 |
| **2013 Avg Household Income** | **$50,851** | **$50,782** | **$50,193** |
| **2013 Med Household Income** | **$38,865** | **$37,323** | **$35,156** |
| **2013 Households by Household Inc:** | | | |
| <$25,000 | 2,905 | 32,195 | 83,531 |
| $25,000 - $50,000 | 2,954 | 24,129 | 55,397 |
| $50,000 - $75,000 | 1,688 | 15,488 | 34,890 |
| $75,000 - $100,000 | 1,091 | 8,838 | 20,797 |
| $100,000 - $125,000 | 606 | 4,451 | 11,269 |
| $125,000 - $150,000 | 266 | 1,888 | 5,384 |
| $150,000 - $200,000 | 199 | 2,194 | 5,781 |
| $200,000+ | 32 | 1,303 | 3,111 |

9

JS 44-TXND (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
DONNA Y. T. CHING, as Trustee of the Ching Family Trust (Trust B), Restated March 22, 1984, and under Declaration of Trust Split dated June 7, 2014

## DEFENDANTS
VRE CHICAGO ELEVEN, LLC; VERDAD REAL ESTATE, INC.; EXP REALTY ADVISORS, INC.; and TARTAN REALTY GROUP, INC.

**(b)** County of Residence of First Listed Plaintiff   Los Angeles County, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Janna Ward Clarke
309 West 7th Street, Suite 1100
Fort Worth, TX 76102   Tel: (817) 335-1615

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☒ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Fraud and negligent misrepresentations relating to real estate transaction.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ 1,000,000.00+
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED PENDING OR CLOSED CASE(S) IF ANY
*(See instructions):*
JUDGE HON. JOHN McBRYDE
DOCKET NUMBER 4:16-CV-074-A

DATE
06/07/2016

SIGNATURE OF ATTORNEY OF RECORD
*Janna Clarke*

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |